Argued September 15; affirmed November 9, 1933; argued on
rehearing February 20; former opinion adhered to
March 28, 1934

# STATE *v.* JORDAN

(26 P. (2d) 558, 30 P. (2d) 751)

*Irvin Goodman* and *Leo Levenson,* both of Portland (Gus J. Solomon, of Portland, and Lawrence Seltzer, of Seattle, Wash., on the brief), for appellant.

*T. R. Gillenwater,* District Attorney, of Klamath Falls (D. E. Van Vactor, of Klamath Falls, on the brief), for the State.

BEAN, J. It appears that on June 3, 1932, the Southern Pacific train, No. 16, arrived in Klamath

Falls at 10 o'clock p. m. Its dining car steward was F. T. Sullivan. Upon arrival the dining car was cut out of the train and switched to a side-track in the railroad yards. The dining car crew, consisting of eight negroes, retired at about 9:45 p. m., just prior to its arrival in Klamath Falls, the crew sleeping on improvised berths made up in the dining car. While the dining car was in the railroad yards, at about 11 o'clock p. m. of June 3, 1932, one of the dining car waiters, Curtis Manuel, was awakened on hearing groans and moaning coming from the berth of the steward, Sullivan, in the dining car. Manuel called to the steward to ascertain the reason for the noise, and, getting no response, got out of his berth and walked over to Sullivan's berth, opened the curtains and saw him sitting up, both hands to his head and bleeding profusely. Sullivan was unable to speak and Manuel called the crew. The lights on the car were turned on and a brakeman who was in a chair car notified. First aid was rendered to Sullivan and obviously he was badly injured. He was taken from the train to a hospital in Klamath Falls and later removed to the Southern Pacific hospital in San Francisco, where he died October 15, 1932. An autopsy showed his death resulted from the felonious assault occurring on June 3, 1932.

It is contended by counsel for defendant that substantial error was committed by the trial court in not excluding the jury at the time the testimony in regard to the competency of the confession of defendant was being heard. The defendant made no request to have the jury excluded from hearing the testimony. The district attorney suggested that the testimony be taken outside of the hearing of the jury. Counsel for defendant requested that the defendant be permitted to con-

tradict the testimony offered to show that the confession was voluntarily made and that the defendant be permitted to take the stand.

■ Notwithstanding the condition of the record, we are inclined to consider the question now raised. After hearing the testimony pro and con the court admitted the confession in evidence. It is determined to be the law that when, upon the trial of a criminal cause, a confession of a defendant is offered in evidence, it then becomes necessary for the trial court to ascertain and determine, preliminary to its admission, whether the confession is competent and was obtained from the defendant free from the influence of hope or fear, exercised by a third person over the prisoner's mind: *State v. Moran,* 15 Or. 262 (14 P. 419); *State v. Rogoway,* 45 Or. 601 (78 P. 987, 81 P. 234, 2 Ann. Cas. 431); *State v. Blodgett,* 50 Or. 329 (92 P. 820); *State v. Roselair,* 57 Or. 8 (109 P. 865); *State v. Garrison,* 59 Or. 440 (117 P. 657); *State v. Spanos,* 66 Or. 118 (134 P. 6); *State v. Morris,* 83 Or. 429 (163 P. 567); *State v. Howard,* 102 Or. 431 (203 P. 311); *State v. Green,* 128 Or. 49 (273 P. 381).

■ The general rule is that the preliminary investigation made by the court, preliminary to the admission of a confession, should be heard out of the presence or hearing of the jury, and if it should be made to appear at any time during the progress of the trial that the confession was made under such circumstances as to render it incompetent as evidence, it should be excluded by the court. When the confession is admitted in evidence as competent and is not rejected by the court during the trial, its weight and value as evidence are for the jury. Although the preliminary investigation into the voluntariness of the confession should properly

take place in the presence of the court alone, the hearing of the preliminary matter in the presence of the jury is not prejudicial where the confession is admitted in evidence, for in such a case it is for the jury to decide ultimately what weight to give to the confession: 1 R. C. L. 529, § 123.

■■ The confession of the defendant, whether in the course of a judicial proceeding or to a private person, cannot be given in evidence against him when made under the influence of fear produced by threats, nor is it sufficient only to warrant his conviction without some other proof that the crime has been committed: § 13-932, Oregon Code 1930.

■ The better practice is that all doubtful questions of evidence or procedure should not be proposed or discussed in the presence of the jury. The court should exclude the jury while hearing the preliminary testimony on the question of the admissibility of evidence generally, or documentary evidence. Whether offers of proof should be made out of the presence or hearing of the jury is discretionary with the trial court. It has been held that an offer in the presence of the jury is not error in the absence of a request that the jury retire: 64 C. J. 135, § 156.

We do not commend the procedure in the present case, but fail to see how the rights of the defendant were prejudiced.

■ The court should determine, prior to permitting the confession to go to the jury, whether it was or was not voluntary; and in deciding the question, it is vested with a considerable measure of discretion, which should be exercised with great care, to the end that the due and proper enforcement of the law on the one hand is not impeded and that no injustice is done defendant

on the other. The court may, after it has admitted a confession as evidence, rule it out, if satisfied by any subsequent evidence that it was not a free and voluntary one: 16 C. J. 735, § 1513.

If the trial judge finds that a prima facie showing is made to warrant the finding that the confession was voluntary and allows it to go to the jury, then that tribunal has the right to consider all of the evidence in determining how much weight and credibility should be given to the confession. Hence, it was competent for the state to impeach the testimony of the defendant, even after the confession had been admitted, as the triers of fact were the arbiters of that question in passing upon its weight and credibility.

In discussing the question of the admissibility of a confession in the case of *State v. Humphrey,* 63 Or. 540 (128 P. 824), at page 553, Mr. Justice BURNETT records the following language:

"The admissibility of a confession is in the first instance a mixed question of law and fact to be determined by the judge who hears the case. In the nature of things much latitude must be given to that judicial officer in the decision of such questions. His judgment on that point is not to be disturbed, unless there is apparent and manifest error." (Citing authorities).

In this state it has been held that the matter is in the discretion of the trial court and unless abused would not be considered error: *State v. Roselair,* supra; *State v. Spanos,* supra; *State v. Peare,* 113 Or. 441 (233 P. 256) ; *State v. Morris,* supra.

In *State v. Roselair,* supra, a criminal case in which the confession was admitted in evidence, the trial court, to facilitate the dispatch of business, permitted such testimony to be given by witnesses in the hearing of the

jury, and it was held its action in this respect was a matter of discretion which was not abused, and hence in denying the request no error was committed. In the present case no request was made by the defendant that the testimony should be heard by the court alone.

■ Mrs. Callie M. Timms, a witness for the state, who had known defendant since 1928, and whom the defendant calls "mother", testified that she talked with the defendant Jordan on Monday, after the date of the alleged crime, and he said he was not guilty; that afterwards she was informed that Theodore wanted to talk with her about the case and she went over and saw him. Upon being asked who was with her when she talked to Theodore, the second time, on Tuesday, when he was going to tell the truth, she answered:

"A. I was alone, first;—you remember, I was alone and then when I sent for you I was to tell the story both to you and Mr. Low. I did not feel I wanted to trust myself with what Theodore said; I just wanted you to know it, how he said it.

 * * * * *

"The Court: (To witness) When you went over and saw Theodore Jordan on this particular day, did he tell you he wanted to make a statement to you?

"A. Well—

"The Court: What were his words?

"A. Well, no, he said—I want to be sure about it, but then Theodore said,—I do not know; but, anyway, he said he would tell me the truth about it. I said, well, all right I wanted him to. So then he commenced to tell me."

She testified further:

"I talked to him, and I did not want to trust my memory of all he said so I asked if I could send for you and Mr. Low, and he tell the story before both of them. He said yes. So I sent for both of you but only Mr. Low came. Then he told this story.

"Q. In the presence of Mr. Low?

"A. In the presence of Mr. Low.

"Q. He admitted to you, then, to begin with, before Mr. Low had came into the room, that he was guilty of the crime; is that correct?

"A. He just told me, just the same as he told Mr. Low.

"Q. And when Mr. Low came in, at your request, and with his agreement, it was all right with him was it?"

Upon being asked to tell what statement the defendant said in the presence of Sheriff Low, the witness stated, in effect, that he said "he did not do it but he was in the middle of it". And he claimed that another person beat the steward.

A careful reading of the testimony pertaining to the confession satisfies us beyond a reasonable doubt that the confession was voluntarily made without fear or hope of reward, and that the trial court committed no error and did not abuse its discretion in hearing the testimony in the presence of the jury.

In *State v. Morris,* supra, Mr. Justice HARRIS, in a concurring opinion, set forth the procedure to be followed by trial courts. This opinion was approved in the later cases of *State v. Stevenson,* 98 Or. 285 (193 P. 1030), and *State v. Green,* supra. The opinion of Justice HARRIS reads as follows:

"The province of the judge is to determine, not whether the confession was in fact voluntary, but whether a sufficient *prima facie* showing is made to warrant a finding that it was voluntary. If the judge tries out the preliminary question of the admissibility of the confession by hearing all the evidence on both sides in the presence of the jurors and if he receives the confession and allows it to go to the jury then the triers of the facts have a right to consider all the evidence in determining how much weight and credibility

should be given to the confession; and so, too, if the preliminary question is decided in the absence of the jury, either party is entitled upon demand to have the jury hear the witnesses tell about the circumstances which relate to the voluntariness of the confession."

In the opinion by Mr. Justice McNARY in the case of *State v. Spanos,* supra, we find the following language:

"As a final contention, counsel for the defendant take the position the court erred in denying the request that the testimony to determine the admissibility of the confession be heard in the absence of the jury. It is impossible to see how the defendant could have been prejudiced by the action of the court of which he complains. Doubtlessly, to facilitate the dispatch of business, the court permitted the testimony concerning the character of the confession to be given in the hearing of the jury. Inasmuch as the court decided the confession was admissible, no error was committed in permitting the jury to receive the evidence while the court was acting as a tribunal to estimate its competency."

After the defendant admitted his guilt to Mrs. Timms, the sheriff, and the district attorney, the confession was reduced to writing and signed by the defendant. The defendant Theodore Jordan testified to show that the confession was not voluntary. He admitted that there was no quarrel between the state of Oregon and himself, but there was a quarrel between one of the deputy district attorneys and himself and also with W. G. Chandler, special agent of the Southern Pacific Company, and he claimed that he had been arrested before by W. G. Chandler in 1924 and 1928, and, in effect, that he was not guilty of the crimes for which he was tried and convicted at those times, and that Chandler, the special agent, was behind it all. The state offered in evidence the testimony of Sheriff Low, the district attorney, the deputy district attorney

and others to the effect that the statement of the defendant Theodore Jordan was voluntarily made, without any duress or undue influence, threats or promises of reward of any kind. The testimony of the defendant that he was treated cruelly and was not given plenty to eat, shows that he overreached himself badly in his testimony. At one time, while he was being questioned, he was taken to a restaurant with the district attorney and his deputy and was permitted to order whatever he wanted. The officers were kind and fair to the defendant. The most serious charge the defendant makes in regard to being compelled to confess was that they abused him and produced scars upon his left arm. The state called J. S. Murray, chief clerk of identification at the state penitentiary in 1929, who testified that at that time he examined the defendant Jordan when he was received at the penitentiary and he made a record of the marks and scars of identification and that he had a large round scar back of his left forearm five inches long. His testimony is more of a general complaint against the special agent Chandler during a series of years and is so plainly refuted by credible testimony that it is unnecessary to refer to it. It is plainly shown that defendant Theodore Jordan was informed of his right; that he was not required to make a statement, and that the same might be used against him in the trial of any action. In his confession, after stating differently once or twice and placing the blame upon another person, he gives the details of the commission of the crime on June 3, 1932, that he went to the railroad yard of the Southern Pacific in Klamath Falls and planned to rob the dining car steward when the train arrived in Klamath Falls. After endeavoring to secure a revolver, but with no successful results, he decided the appropriate thing to do was to hit the

steward on the head with something, and he found a piece of one-inch water pipe, about two feet long, which he wrapped in a newspaper and hid in the grass that evening. He came back later on and secured the pipe, boarded the dining car on the blind side. He turned off the lights in the car. He knew where the steward was sleeping. He searched for cash and searched his handbag but found no money in it. He entered the man's berth by unbuttoning the curtain at the foot of the berth and walked in. He states:

"For some reason the train gave a sudden jerk and the steward turned over on his right side. He was asleep. Then I struck the man with the pipe I had, but I took the paper off the pipe before I hit him. * * * I hit him about eight or ten times."

Error is predicated upon the part of the court in permitting the prosecuting attorney to interrogate the defendant on cross-examination relative to a previous criminal conviction. The defendant Jordan in his direct examination, concerning the admissibility of the confession, brought out the fact of his previous conviction in California, and also in Klamath county. He testified concerning the bad feeling between himself and Deputy District Attorney D. E. Van Vactor and the witness W. G. Chandler, and he attempted to show that he had been previously "railroaded" to the penitentiary by Chandler from Dunsmuir, California, and on another occasion by Chandler, Van Vactor and District Attorney Gillenwaters from Klamath Falls. He claimed that in California the witness Chandler had kicked him and shot him. The cross-examination was confined to his testimony in chief, and the trial court did not err in permitting the cross-examination complained of. The witness Chandler testified, in effect, that he never shot

the defendant or used any force upon him, and he was corroborated by witness A. H. Calkins, sheriff of Siskiyou county, California, who arrested the defendant and had him in charge for the crime the defendant referred to when he was sent to San Quentin and the sheriff states that he never complained of being shot. The circumstances in the present case are peculiar in that the same officers that obtained convictions for the previous offenses obtained the confession in the present case, and the defendant claimed there had been a continued persecution of him by Chandler. If the charges of force and violence by the same officers in the previous prosecution were permitted to go unchallenged to the jury, it would, in effect, deny the state the right to show that the confession in the instant case was voluntary, and the right to show the circumstances surrounding the obtaining of the confession so that the jury could correctly determine the weight and credibility to be given the confession: *State v. Roselair,* supra; *State v. Morris,* supra; *State v. Spanos,* supra.

The defendant assigns error in permitting the witness Lyon to testify concerning the actions of the defendant soon after the alleged commission of the crime. It is shown that the defendant did not stay at his own home the night of the crime, did not occupy his own bed, could not be located at the usual haunts of the colored people, and that he occupied a vacant house that night. There was nothing in Lyon's testimony that was improperly admitted to prejudice the rights of the defendant. The case differs from those cited by counsel for defendant: *State v. Hogg,* 64 Or. 57 (129 P. 115).

Defendant assigns that the court erred in sustaining an objection to the cross-examination of the wit-

ness S. M. Gilbert, as to his "common-law" wife's vocation. This witness testified that he was a cook by trade, and a gambler by profession; that he was the "common-law" husband of a colored lady, and was never married to her; that he lived with her as her husband. Upon being further interrogated as to what she did, after he stated it was that of housewife, the court properly sustained an objection. It was not material or competent for defendant to attempt to impeach the witness Gilbert by obtaining his testimony as to his "common-law" wife's occupation. The extent of such cross-examination rests within the discretion of the trial judge, and we see no abuse in such discretion. The witness admitted that he was a professional gambler, and we are unable to see where any further inquiry into his habits and associates would cause the jury to give less weight to his testimony. Gilbert testified that defendant "talked to me about the dining car * * * all about the car coming in, how it came in and what they done; * * * He told me how easy it was". Witness Gilbert testified further:

"A. He told me on the dining car,—that he could make some money.

\* \* \* \* \*

"A. He said that he studied it out in the penitentiary and had it in his mind, and we could go out there; and they left Oakland with a certain amount of money and when they got here the money would be around two hundred dollars, and he said we would go down and get it; and I told him I did not participate in it, while I let him talk for a long time. I told him I would not, so he asked me to loan him my gun and he would go get the money * * * and split it with me * * * and I refused."

■■ Defendant assigns error of the court in denying defendant's counsel the opportunity to fully cross-

examine state's witness Ethel M. Mestas, an ex-criminal. She was asked on cross-examination if she had ever been convicted of a felony and she answered in the affirmative. She was asked if she was a drug addict and stated that she was not. The witness stated that she took notes in regard to this matter to refresh her memory, due to her age and nervous condition, as she felt she might need the notes. To the question "What is the nature of that nervous condition you mention?" the court sustained an objection. The witness had answered that she was not addicted to the use of drugs, unless cigarettes are called drugs, and the court properly exercised its sound discretion in sustaining an objection to such further inquiry: *State v. Gleim,* 17 Mont. 17 (41 P. 998, 31 L. R. A. 294, 52 Am. St. Rep. 655.) It was a question for the jury to determine as to the credibility of this witness. Ethel M. Mestas testified that about May 28 or 29 of that year she had a conversation with defendant Theodore Jordan and, upon being requested to relate the conversation, testified:

"In the evening I had a conversation with the defendant and during this conversation he verbally diagramed his intention of visiting the S. P., of which he had formerly been employed; he stated that he knew the routine of the S. P.; that he was familiar with that the deceased, Sullivan, returned with an amount anywhere between two hundred and fifty or three hundred dollars, balance of his run; also, on his leaving Klamath Falls he usually carried the sum of one hundred dollars."

She stated that defendant asked her if she had a gun and explained to her what he wanted to do with the gun, that he intended robbery. Defendant "said he was going down to the S. P. train which arrived in here somewhere after the hour of 10 o'clock, and he stated to me how he would go and what he would do;

he stated either the deceased would have the money on his person or in drawer somewhere on this diner, and that if he interfered in any way he would 'bump him off', or anybody else who interfered''.

It is assigned as error that the court erred in permitting the witness A. H. Calkins to testify concerning the fact that the defendant Jordan had once been convicted of a burglary charge and sentenced to San Quentin penitentiary, and that while on the way to the penitentiary he escaped from the officers and was later captured. This testimony of Sheriff Calkins pertained particularly to the facts brought out by defendant in his examination in chief and, as we have already noted, the state had the right to refer to the testimony given by the defendant. It was proper for the state to show the conviction of a crime to discredit the defendant's testimony: *State v. Gilbert,* 138 Or. 291 (4 P. (2d) 923); *State v. Deal,* 52 Or. 568 (98 P. 165). It was the defendant who showed the previous convictions of crimes and not the state. It was proper for the state to show the circumstances surrounding the taking of the confession as to its voluntariness and to impeach the defendant who was a witness in his own behalf by proof of contradictory statements. *State v. Bartmess,* 33 Or. 110 (54 P. 167), where it is stated:

"If he has made at other times statements which are inconsistent with the testimony given by him at his trial, he may be impeached by proof of such contradictory statements in the manner prescribed by the statute."

The defendant further contends that the court erred in permitting the witness Chandler to testify concerning previous convictions and the circumstances surrounding them. We should bear in mind that the defendant himself had testified concerning those convictions and he connected his treatment at that time with

the efforts to obtain a confession in the present case. He testified that Chandler, in order to obtain a confession, beat him, kicked him and shot him. The witness Chandler did not testify concerning the circumstances surrounding the burglary but that he had not used any force or violence on the defendant at that time or any other time. His testimony in this connection is supported by Sheriff Calkins. This testimony was entirely proper as rebuttal in order to inform the jury of the true circumstances surrounding the obtaining of the confession in the instant case: *State v. Gilbert,* supra. The testimony relative to a previous confession and conviction was not a collateral matter because by the testimony of defendant Jordan himself it was made part of the circumstances surrounding the obtaining of the confession in the case at bar. In regard to Chandler's testimony relative to the defendant's conviction in Klamath county in 1928, the defendant in his direct examination testified that Chandler took part in that prosecution and had a hand in "double-crossing" him into the penitentiary. Witness Chandler merely testified in rebuttal that he had nothing whatever to do with questioning or prosecuting the defendant for the robbery in 1928.

A careful examination of all the testimony shows that the confession of the defendant was voluntarily made, that it is strongly corroborated by other witnesses, and that the defendant had a fair and impartial trial, notwithstanding his statement to the contrary.

We find no error in the record. Therefore, the judgment of the circuit court must be affirmed. It is so ordered.

————

KELLY, J. (dissenting). The defendant is under sentence to die because of his alleged violation of the

law. On principle, the tribunals, which condemn him, should be required to conform to the procedural law governing the trial of criminal cases before invoking the substantive law as a ground for taking his life.

With due respect for the opinion of the court and for the venerable, experienced and learned jurist, who wrote it, the writer is unable to convince himself that approved procedure was followed in the trial of this case.

Upon the offer by the state of a purported confession of defendant, the question of its admissibility was presented. In the first instance, that is a question to be determined by the judge of the court. If the judge sustains the defendant's objection, the question cannot be considered by the jury at all. When the question is determined, the course taken by the judge in hearing and determining it should not have the effect of enlarging the scope of the testimony which the state is entitled to submit upon the issue of defendant's guilt or innocence. In the opinion of the writer, the trial court gave it such effect.

The defendant did not offer himself as a witness upon the issues joined by the charge in the indictment and his plea of not guilty. Notwithstanding that, after the confession had been admitted, which certainly must have been after the preliminary question of its admissibility had been determined by the judge of the court, the state was permitted to introduce testimony impeaching defendant's statements made while said preliminary question was being tried by the judge; testimony concerning the commission of another crime committed in California; his escape from the officers there; testimony concerning the prison record of scars upon defendant's arm and of his incarceration in the penitentiary in Oregon. There is no rule of law known

to the writer which renders any of this testimony so received admissible in a criminal case where the defendant neither offers himself as a witness nor offers the testimony, for the consideration of the jury, which he has given upon the alleged inadmissibility of his confession.

Knowing the loquacious temperament of defendant, the very efficient and experienced district attorney, who prosecuted this case, quite properly requested that the jury be excused when the evidence upon the question of the admissibility of defendant's confession was being heard by the judge; but it is no answer to say that approved procedure was disregarded in reference to the showing addressed to the judge of the court upon the admissibility of defendant's purported confession, and hence, it was proper further to disregard it in reference to impeaching a defendant who does not testify as a witness upon the issues joined.

Neither is it an answer to say that, if the jury had not been present when the preliminary question of the admissibility of defendant's confession was being tried by the judge, the defendant would have offered himself as a witness and thereby would have given the state the right to introduce impeaching evidence. To say this, is to speculate upon what the defendant would have done, but did not do. In a criminal case, especially a capital case, mere speculation alone is not a sufficient basis upon which to receive seriously damaging evidence against the defendant.

Before the hanging of a man may be legally justified, such a man must be given a trial at all points in conformity with the law. The writer is unable to convince himself that such a trial was accorded defendant herein; and, therefore, dissents.

ROSSMAN, J., concurs in the foregoing dissent.

Rehearing granted and former opinion adhered to March 18, 1934

On Rehearing

(30 P. (2d) 751)

*Leo Levenson* and *Irvin Goodman,* both of Portland (Gus J. Solomon, of Portland, and Lawrence Seltzer, of Seattle, Wash., on the brief), for appellant.

*T. R. Gillenwaters,* District Attorney, of Klamath Falls (D. E. Van Vactor, Deputy District Attorney, and Hardin C. Blackmer, both of Klamath Falls, on the brief), for the State.

BELT, J. The defendant, Theodore Jordan, a colored man, was tried and convicted of the crime of murder in the first degree. The death penalty was imposed. On appeal the judgment of conviction was affirmed. A rehearing having been allowed, it remains for this court to determine whether such error has been committed as to warrant a reversal of the judgment and a remanding of the cause for a new trial.

Has the guilt of the defendant been established beyond a reasonable doubt? Has he been given that fair and impartial trial which the law contemplates? Or, has he, as his counsel contend, been the victim of a miscarriage of justice? These questions will be given earnest consideration. We are not unmindful of the fact that a human life is at stake. Let us turn to the record.

About 11 o'clock on the night of June 3, 1932, F. J. Sullivan, a dining car steward, was assaulted by being repeatedly hit over the head by some blunt instrument while he lay asleep in his berth in a car sidetracked in the Southern Pacific railroad yard at Klamath Falls, Oregon. The injuries were of such serious nature that Sullivan was taken to the Southern Pacific hospital at San Francisco, where he lay for months in a semiconscious condition hovering between life and death. He was never able to talk or to recognize any person, and died on October 15, 1932. That the attack made upon him was the direct cause of his death is not questioned.

On the night of May 28, 1932, Jordan was seen on this same diner as it was side-tracked in the yards after the day's run from Oakland. J. S. Garner, a colored man and an employee of the railroad company, saw Jordan on this occasion and talked with him. When Garner asked Jordan, ''Say, what are you doing in this diner?'' the latter replied, according to the testimony of Garner, that he ''wanted to see one of the Oakland boys—that he used to live in Oakland and I heard he was over here''. Eugene H. Love, a yard man, saw Jordan on this same night and talked with him. According to Love, Jordan told him ''that he either had a brother working on the diner or else he wanted to ask something about a brother''. Jordan in his testimony, aside from his confession, admits being on the diner and talking with Garner. It is the theory of the State that Jordan on this date was looking ''the situation over'' with the intention of committing a robbery. On the night of the attack, Sullivan had $282.25 in his possession, being dining car receipts.

Mrs. Callie Timms, a colored woman, testified that Jordan left her home in Klamath Falls about 10 o'clock

in the evening of June 3, 1932. Elton V. Jackson, a state police officer, testified that he saw Jordan about 10 o'clock on this night, as he was coming out of an alley near the Court View hotel and that "he had a long object wrapped up in a newspaper under his arm". Jackson said that when he turned the lights of his automobile on him, Jordan "pulled the object more in front of him out of my sight". The State claims that this object was a piece of pipe about eighteen inches long used by Jordan when he struck Sullivan over the head. Jordan asserts it was a roll of cellophane which he had purchased from Montgomery Ward & Co. The manager of the store testified that no cellophane was carried in stock. Howard C. Short, a yard man for the railroad company, testified that on the night the crime was committed he saw a person of about the same stature as the defendant board the dining car in question. He said that this person "started running along this moving equipment and the door on a car was open but the trap was down, and this man run alongside of the equipment and reached over and laid something up on the trap and stepped on the step, grabbed hold of the grab-handle and crawled over the trap; the trap was level with the car floor, and *he laid this thing in on this trap* and then boarded the car and went on in. That was the first time I ever saw anybody board that passenger equipment going out to make the turn around". Howard Hendricks, the locomotive fireman, also testified that he saw a person in a dark overcoat and cap board the car at about 10:38 o'clock on the same night.

Jordan was arrested at about 7:45 on Saturday morning by city police officers Lyon and Arnold. They had been looking for Jordan the greater part of the night but were unable to find him at the usual

places where negro people in that community congregated. The officers went twice every hour from 1 a. m. until 6 a. m. to the place at 46 Main street where Jordan roomed, but were unable to find him. Later investigation developed that the bed had not been used that night. After the arrest, Jordan was asked where he had stayed during the night and, according to witness Lyon, the defendant said 625 Plum street. Later, when other officers together with Lyon and Arnold, investigated the house at the last above named street address, the house was vacant and had a "For Rent" sign thereon. It contained a stove, bed, and mattress, but no covers.

After this investigation, Officers Lyon and Arnold took Jordan to see W. G. Chandler, a special agent of the Southern Pacific Company. Chandler testified that he went out from his office to where the car was and said "Good morning" to Jordan and that the defendant told him that he "had the wrong man this time". Chandler, in addressing Jordan, further said, " 'You remember you have lied quite a lot before, and I suspect you are lying this time; and if you are guilty of this terrible crime it is going to mean your neck,' and I did draw my hand across my ——." This statement by Chandler is relied upon strongly by the defendant as tending to show that he was under duress and fear at the time he signed the confession of his guilt, to which later attention will be directed. After this conversation with Chandler which occurred Saturday morning, Jordan was confined in the county jail. The investigation of the crime continued.

While in jail, Jordan was questioned at some length concerning the crime charged and on Saturday night made a written confession in the office of the district

attorney. The State does not rely upon this confession and the defendant says it was a "damned lie". After making this confession, Jordan was taken to a restaurant in Klamath Falls about 11 o'clock Saturday night to get something to eat. Jordan was returned to jail late Saturday night. On Sunday afternoon, Jordan was again taken to the district attorney's office where, in the presence of the district attorney Gillenwaters, Loyd Low, sheriff of Klamath county, Deputy District Attorney Van Vactor, and a shorthand reporter, Dewey Powell, he dictated the second confession, the one offered in evidence, which the State asserts is the truth. Chandler was not present. Jordan was then brought back to jail. After the shorthand notes were transcribed, the written confession was, on Sunday evening, taken to the jail, whereupon Jordan signed the same in the presence of Powell, the reporter, Gillenwaters,. Van Vactor, James A. Wherland, a telegraph operator, and Hardin C. Blackmer, a deputy district attorney, and Rex McMillan, a deputy county sheriff. Chandler was not present. He had, however, previous to the making of the confession, questioned the defendant at length concerning the commission of the crime. All of these witnesses, with the exception of Gillenwaters, testified that Jordan read the confession over before he signed it. Wherland, in response to the question, "What was the demeanor and general attitude of the defendant at that time as you observed it?" answered, "Well, he seemed to be in very good spirits; he seemed to be glad to get something off of his mind. He read it over and Mr. Blackmer asked him if it was okey and he said: 'Yes, it is all right', and walked over and signed it. He seemed to be very glad about it."

The alleged confession reads as follows:

"I, Theodore Jordan, being first duly sworn, depose and say: That I make the following statement freely and voluntarily, without duress, undue influence, threats or promises of immunity of any kind, nature or description and knowing that the same can be used against me in the trial of any action arising out of the contents of the same, and that I do hereby consent that the same may be so used against me.

"That on the night of the 3rd of June, 1932, in accordance with previous plans made by myself, I went to the railroad yard of the Southern Pacific Company, Klamath Falls, Klamath county, Oregon, with plans to rob the dining car steward when it arrived in Klamath Falls, Oregon, about 10:15 p. m. After having made several attempts to secure a revolver but with no successful results, I decided the appropriate thing then to do would be to hit the steward on the head with something. After searching for some particular implement with which to hit the man, I found a piece of 1-in. water pipe about two feet long. I found this behind the Court View Apartments in the alley. This I wrapped in a newspaper. That pipe seemed to serve my purpose very well and I picked up and hid it in the grass that evening. I came back later on my way to the Southern Pacific railroad yards to rob the steward and secured the pipe and wrapped it in a newspaper. I came out of the alley and turned down back of the jail and went to the yards. I boarded the dining car on the blind side. The door was open but the trap was down so I took hold of the bars and climbed over and had the pipe in my hand still wrapped up. I entered the dining car and sat down, the dining car crew was in bed in the car. I looked around and noticed that the lights were plentiful and decided to put them out which I did. I ran my hand up a row of switches and turned all the fans on and then I turned them off. I was dressed in my dark trousers and an old shirt and an overcoat and cap. After I discovered there was too much light I decided to put them out. I then got up and put out one light in the front end by unscrewing

the bulb. Then I went back and sat down and the train started. Finally I got up and went to the steward's berth and looked in. I knew where the steward was sleeping. I began searching around for keys and looked in his coat but they weren't there but I did not look in his pants. I looked under the bed and found his hand bag. I took that down to the kitchen end of the car and searched it. I didn't find any money in it so I brought it back. The train stopped again and I stood behind the steward's berth for about five minutes until the train started again. Then I entered the man's berth by unbuttoning the curtain and the foot of his berth and walked in. I looked at him for about 10 seconds. He was laying on his left side with his face towards the aisle. For some reason the train gave a sudden jerk and the steward turned over on his right side. He was asleep. Then I struck the man with the pipe I had but I took the paper off the pipe before I hit him. He raised up with his left hand slightly raised and I struck him across the hand. He just grunted. I hit him about eight or ten times. I hit him hard the first time and then hit him easy the other blows. The first time there was kind of a thud but the rest of the blows were easy. All of this occurred while the train was moving. I discovered that one of the waiters had been awakened when I looked around to see if anybody was getting up. I could see the lower part of the waiter's body from under the curtain on the opposite side from the steward's berth. When I saw this man I ran out. I never got a thing. I got off the train and let a couple of cars go past and then I got on the last car. I threw the pipe off fairly close to the overhead bridge below Shaw-Bertram's mill. I got off the train then and walked down to the burner at the Shaw-Bertram mill. I put the coat cuffs and gloves in the fire and burned them. These had blood on them. I walked down the track a ways maybe a city block and I struck another match and saw blood on my overcoat sleeves. I went over to a little mud hole to wash the blood off in the water. It didn't seem to come off well enough to suit me so I went back to the burner again

and threw the coat in and walked back the tracks to the Ewauna Box company. I turned left and went through the lumber yards and went down Commercial street to Seventh street. I went up Seventh street to 625 Plum street. I went in that house and took off the shirt I had on and burned it up and put on a clean shirt and dress coat which I left in that place. I figured I might accidentally get some blood on me so I prepared. On the way to the train I left my dress coat and a clean shirt at the house. I then went over to the Club. I arrived at the Club about five or ten minutes ahead of Mr. Lyons of the Police Force. I came out and met Officer Lyons.at the door when he came in. He flashed his light on my face and said 'Hello'. I stood there for a little while and the officers were inside and then I decided to ask Alice for a blanket. Her husband's name is Sunny and they live close to the Club. I never saw her before. I stood on the side porch and talked with her. She opened the door and talked through the screen. She inquired about the law and after I asked for the blanket she suggested that I go over and see who was arrested. The Law went away and I went over to see if anyone was arrested. There was nobody arrested. Then I decided to go over to 625 Plum street and spend the rest of the night which I did and I got up the next morning early about 6:30 and came up 7th street and met a police officer and said 'Good morning' and he returned the greetings and I turned west on Main and turned at 3rd street to the alley and I passed three State Police officers and said good morning to them. Then I went over to Mrs. Timms house. She offered me some breakfast and asked me whether I had gone to church the night before, to which I said, 'Yes'. Then she informed me that the officers had been there the night before inquiring for me and they wanted to know if I lived at that house. She said no that I didn't live there but I had been taking my meals there which was the truth. She also explained that she invited the officers in but they accepted her words as true. She asked me what was the reason they were looking for me. I explained

that perhaps it was because I was living on Main street where they didn't want the colored people to live. She then suggested that I take the matter up with Mrs. Dennison in regard to the police officers chasing me around. I agreed to go and see Mrs. Dennison. Just as I left Mrs. Timms' house and arrived at the corner of 2nd and Klamath the police officers drove up and arrested me.

"I was alone on this robbery, it was my own idea and there was nobody connected with it in any way. No one talked to me about the robbery and I went on this robbery alone.

"I went down to the railroad yards on May 16th, the night Earl Carrol's show was in town and the next time I went down was about May 23rd. I just went down and inquired for Spencer Jordan and I got in the day coach with the brakeman and while talking with them the train went out to the 'Y'. That is when I first learned that the train took the diner down and turned it around. I have worked on the Southern Pacific all told about three months as a waiter on the dining car and I am familiar with the diners and I know where the crew and the steward sleeps."

Mr. McMillan, the deputy county sheriff, testified that on the same night, after Jordan signed the confession, viz., Sunday evening, June 5th, he had a conversation with Jordan in the jailer's bedroom and that he told him "he had planned to commit this crime and that he had found this piece of pipe in the alley over here back of the Court View Apartments, and that he took the pipe and came out of the alley and went down around the corner of the jail, and went down to the railroad yard and boarded the diner and struck the steward in the head several times, and while the train was returning from the Texum 'Y' he got off the train near the Shaw-Bertram Mill; and at that time he went to the burner near the Shaw-Bertram's and burned up his overcoat and gloves".

The confession was signed by the defendant on Sunday evening. Mrs. Callie Timms, the colored woman referred to by defendant as his "mother", came to see Jordan in jail on the following Monday. She testified, when called by the State, that on this visit Jordan told her he was not guilty. She said, however, that on the next day, Tuesday, June 7th, she called again on the defendant and "that was when Theodore said he was guilty". This witness was recalled by the defendant and, in response to the question, "Now you just tell the jury, Mrs. Timms, what that last statement that Theodore made to you in the presence of Sheriff Low was; just turn to these people and tell them as best you can", answered, "Well as much as I can remember, he said he went down—he said he was in the middle of it but he did not do it—did not commit the crime, or did not do whatever was done, but he was in the middle of it. He said there was a man by the name of Alex Brown, I think, that was connected with it, and he told me just what— Afterwards, when Sheriff Low came in, he told in my presence that it was not—that he did not do it but he was in the middle of it." The record discloses in cross-examination of this rather unwilling witness:

"Q. He did make the statement, however, to you, he was guilty did he not?

"A. Well he said he was in the middle of it.

"Q. Well you made the statement on the State's case that Theodore told you he was guilty?

"A. Well, he might have worded it like that, I don't remember, but I know he said he was in the middle of it."

Sheriff Low testified that Mrs. Timms told him in the presence of the defendant that "Theodore said he was guilty and wanted to tell her about it and she did not

want to be alone and be the only witness to it. And she called for Mr. Van Vactor and I; and Mr. Van Vactor had stepped out, so I stayed in there while he told her he had committed the ——''. Due to interruption by the court, the witness never completed the answer but it is obvious what it would have been had he been permitted to proceed. Low said that in subsequent conversations Jordan told him ''a couple of times about pulling the job'' and had made a proposition to him to enter a plea of guilty and receive a sentence of twenty years in the penitentiary. The sheriff told him that he would not accept his proposition and told him ''it was impossible for him to do it''. It will be recalled that Sullivan was still alive at this time. Could it be that the defendant was seeking a bargain? Jordan took the sheriff to the place near the Timms house where he got the piece of water pipe and also to the place near the Shaw-Bertram Lumber Company's mill for the purpose of showing where ''he had throwed the pipe and where he burned the coat up''. Referring to this matter the sheriff said that Jordan told him ''he burned the cuffs off the coat and went back and burned the coat; after he tried to wash it off and could not wash it off to suit him, he took it back and burned it up, right across the tracks from the factory'' and that he ''rode down, hanging on the back end of the car until he came in sight of the sign of the Shaw-Bertram Lumber Company and he dropped off, and that was where he threw the pipe as quick as he dropped off''. It will be recalled that the matter of burning the clothes to destroy the blood stains and the throwing away of the water pipe were mentioned by Jordan in his alleged confession. Further, Jordan in his confession said that after he came back from burning his clothes he went to the

house at 625 Plum street and "took off the shirt I had on and burned it up and put on a clean shirt and dress coat which I left at that place. I figured I might accidentally get some blood on me so I prepared". The State introduced evidence that the ashes from the stove in the house at 625 Plum street were examined and found to contain some burned shirt buttons. Human blood stains were found on the trousers of the defendant when his clothes were removed at the jail.

A. M. Gilbert testified concerning a conversation with the defendant on June 1, 1932, wherein the latter tried to get him to help in robbing the dining car. Gilbert said Jordan told him "that he had studied it out in the penitentiary and had it in his mind, and we could go out there; and they left Oakland with a certain amount of money and when they got here the money would be around two hundred dollars, and he said we would go down and get it; and I told him I did not participate in it, while I let him talk for a long time; I told him I would not, so he asked me to loan him my gun and he would go and get the money". According to the testimony of Gilbert he refused to lend Jordan the gun and undertook to persuade him not to do the job. It was developed on cross-examination that Gilbert was a professional gambler and the common law husband of a colored woman. The credibility of the witness was a matter for the consideration of the jury.

Ethel M. Mestas, who admitted on cross-examination that she had been convicted of a felony, testified concerning a conversation with Jordan on May 28th or 29th at 46 Main street. She says that "during this conversation he verbally diagrammed his intention of visiting the S. P., of which he had formerly been employed; he stated that he knew the routine of the

S. P.; that he was familiar with that the deceased, Sullivan, returned with an amount anywhere between two hundred and fifty or three hundred dollars, balance of his run; also on his leaving Klamath Falls he usually carried the sum of one hundred dollars". Consider the following portion of the record relative to her testimony:

"Q. Now I will ask you whether or not, Mrs. Mestas, the defendant Theodore Jordan asked you if you had a gun.

"A. He did.

"Q. Did he explain to you what he wanted to do with the gun?

"A. He said he intended robbery.

"Q. Did he tell you who he was going to rob?

"A. He said he was going down to the S. P. train which arrived in here somewhere after the hour of ten o'clock, and he stated to me how he would go and what he would do; he stated either the deceased would have the money on his person or in a drawer somewhere on this diner, and that if he interfered in any way he would 'bump him off', or anybody else who interfered.

"Q. Now, did you loan him a gun?

"A. I did not. When he asked me for a gun I told him I had no gun or never had one in my possession."

She also testified concerning a later conversation with the defendant on the morning of June 3, 1932, at the same place. In this conversation he is alleged to have said "he was going to go through with the plan he had planned to do, and I told him to go on, he was 'nuts', and left him there; that was the expression I used".

In the light of this evidence to which attention has been directed, the jury was evidently convinced beyond any reasonable doubt as to the guilt of this defendant.

The jury undoubtedly believed that the confession introduced in evidence was not obtained through duress, coercion, or promise of immunity.

Before the confession was introduced in evidence, the state offered testimony in the presence of the jury, tending to show that the defendant was not promised any leniency or immunity, nor was he subjected to duress, coercion or threats in order to induce him to make a confession; that he was warned that any statement made by him would be used against him; and that the confession was free and voluntary. The defendant thereupon, through his counsel, requested permission of the court to take the stand and testify relative to the facts and circumstances surrounding the dictation and execution of the confession. Such permission was granted by the court and the defendant, in the presence of the jury, gave a long, weird and rambling story as to how he was subjected to abuse and mistreatment to compel him to confess. He told the jury that there was no quarrel between him and the state of Oregon but there had been a feud between him and Chandler for "over a period of nine years". He thereupon exhibited to the jury certain scars on his arm which he claims resulted from the use of an electrical appliance which he called a "truth tester". He said that while he was in jail Chandler put this appliance on him and that "he put my arm back of my back and attached it to a light socket and there was heat in it and he burned me". He said that they took all his clothing away from him and that he "had no food, no water, no nothing" during Saturday and that "the fireworks" were started in the presence of "Mr. Van Vactor, Mr. Gillenwaters, Chandler, Mr. Low, and Chief Merrill". Jordan testified that Chandler said "Are you going to come clean?" "I said: 'Before I admit I pulled any robbery

job or attempted robbery I will commit suicide first.'
This man said 'Do you want to kick off?' I said 'You
bet, before I admit to you'. He went in his holster and
pulled out this automatic. He said 'Do you want this?'
I said, 'Yes, give it to me.' He said: 'Maybe I had
better use it first.' I said: 'Pull the trigger if you want
to.' He said: 'It would be doing you a favor.' I said:
'Maybe it would.' He put the gun away. I guess he
got cold feet. I looked around at Chandler and he had
one about that long (indicating). He said to me—of
course, I don't like to use this language because it is
not my custom, but if you want to hear it I will say it.
He said, 'you black son-of-a-bitch, are you going to
come clean with the goods, or I will let it go?' I pulled
up my sleeve and showed him where he had done it
before. *This* (indicating) *is where Mr. Chandler shot
me in jail, in 1924 in Dunsmuir, in the little wooden
jail, when I was handcuffed and on the floor and
knocked out.* Here is what happened, if it is of any in-
terest to you people; I was working on a job with a
company from the state of Louisiana.'' Thereupon the
court interposed a question, ''What is all of this
about?'' and when Jordan answered, ''I'm going to
show you how Mr. Chandler worked those third degree
methods on me'', the court said, ''You mean something
that happened before this? If you do, they can cross-
examine you on it and we will have to try this whole
matter out.'' Counsel for defendant then cautioned him
that he had better confine himself ''to what happened
here''. However, Jordan continued, ''I showed them
where *he shot me* and showed where he hit me with a
blackjack and also showed the fillings, where he broke
my tooth out and kicked me once in the mouth when I
was down. I told them what he had done. He forced
me to admit *I stole two revolvers and eight dollars in*

*cash and some whiskey. That was what I was sent to San Quentin for.* I threw it up to him and he did not like it; I threw it up to him (indicating) that he had helped double-cross me and that the defendant's attorney had helped to double-cross him, and I had gave him fifty dollars to oil his mit and he went to Goldendale, Washington, for Christmas with this man.'' Again the court admonished the defendant that he had better not go into all of these matters, but in response thereto the defendant said, ''There is some double-crossing in this matter'' and proceeded to tell about Chandler hitting him with a ''sap'' and injuring his thumb, stating that Van Vactor then ''jumped up and got between us and said 'Nix on the rough stuff'.'' The defendant said that during this alleged mistreatment Van Vactor was behind the desk and Gillenwaters was sitting in a chair. After injecting a great deal of matter wholly irrelevant and immaterial to the issue of the confession, the defendant continued, ''When Mr. Chandler told me to stand up the second time Mr. Van Vactor had sat down behind his desk and I was arguing with this man (indicating), Mr. Gillenwaters, about letting Mr. Chandler beat me up; and at that time Mr. Chandler kicked me in the testicles, and, if this Jury doubts it, I will submit my body for examination. I fell down to the floor, and Mr. Van Vactor and Mr. Gillenwaters helped me in a chair, and at that time Mr. Chandler put that back on my arm, what they called the 'truth tester' and he fixed it up to the light socket and he would sit behind me and ask me questions and he worked something on it and would go 'buzz, buzz,' and it burned me. * * * * * * * * *I did not commit the robbery on Alfred Gould.* I was double-crossed. Mr. Van Vactor assured me if I would plead guilty with assault not being armed with a dangerous

weapon, although they could not find a dangerous weapon, I would get fifteen years. He said, 'You are young—twenty-three. You can do fifteen.' I do not know if it was on the square or not, but I do know he made some awful propositions to me and they have some awful jokers." Jordan thus related how he tried to fasten the crime on another person: "I picked out Alexander Dexter, because if I did not, I knew I was scheduled for another beating and a good one. I knew Alexander Dexter had been on the diner before, and he did not hear he died in 1927; — If I give them the description of a man who was dead they would let me alone, when they searched the records and found he was a dead man. That was why I picked him out. * * * I also told him I was pretty sure he pulled the job." Jordan said that Chandler "sat on the sidelines and dictated the confession", referring to the one which has been introduced in evidence. Jordan claimed that, at this time, Chandler "put the gun on me". The direct examination of Jordan covers twenty pages of the transcript and it is indeed impracticable to set forth in further detail what he said not only about the manner in which the confession was obtained but as to what he did both before and after the alleged commission of the crime. The statements made by the defendant relative to his alleged mistreatment were strongly contradicted by witnesses for the state.

 It is asserted that the trial court erred in allowing testimony to be offered in the presence and hearing of the jury relative to whether the confession was freely and voluntarily executed. No authorities in point from this jurisdiction have been cited to support this contention and none can be found. In the instant case, it was the district attorney and not the defendant who requested the court to exclude the jury during the pre-

-liminary hearing concerning the giving of the confession. Be that as it may, whether or not such evidence be heard in the presence of the jury is a matter resting in the discretion of the trial court: *State v. Roselair,* 57 Or. 8 (109 P. 865); *State v. Spanos,* 66 Or. 118 (134 P. 6); *State v. Morris,* 83 Or. 429 (163 P. 567). The defendant has no cause to complain.

The procedure to be followed by trial courts was clearly stated by Mr. Justice HARRIS in a concurring opinion in *State v. Morris,* supra, and has, without dissent, been approved by this court in the later cases of *State v. Stevenson,* 98 Or. 285 (193 P. 1030), and *State v. Green,* 128 Or. 49 (273 P. 381). Mr. Justice HARRIS said:

"If the judge tries out the preliminary question of admissibility of the confession by hearing all the evidence *on both sides* in the presence of the jurors and if he receives the confession and allows it to go to the jury *then the triers of the facts have a right to consider all the evidence in determining how much weight and credibility should be given to the confession;* and so, too, if the preliminary question is decided in the absence of the jury, either party is entitled upon demand to have the jury hear the witnesses tell about the circumstances which relate to the voluntariness of the confession."

In *State v. Roselair,* supra, a request by the defendant was made to exclude the jury while the preliminary examination relative to competency of the confession was made. This request was denied by the trial court over the objection and exception of the defendant. On appeal it was held that no error was committed, as it was a matter resting in the discretion of the lower court. Also to the same effect see *State v. Spanos,* supra.

Counsel for defendant assert that the trial court erred in permitting the district attorney to cross-examine the defendant relative to his conviction of the crime of robbing Alfred Gould in 1928. It will be recalled that this matter was first brought to the attention of the jury by the defendant. He testified on direct examination that "he did not commit the robbery on Alfred Gould". Was the State bound to remain mute and let the defendant thus impress the jury with the idea that over a course of years he had been the victim of double-crossing and unfair treatment by some of the officers involved in the instant case? Was it not, under such circumstances, permissible for the State to show that the defendant did, in fact, plead guilty in 1928 to the crime of robbing Alfred Gould? Certainly it was a matter affecting the credibility of the defendant.

It is argued, however, that the defendant took the stand solely to testify relative to the voluntariness of the confession and that the evidence should have been confined to this issue. We quite agree. It does not follow, however, that the State is bound to remain mute when the defendant, against the admonition of the court and his counsel, takes advantage of the opportunity to inject irrelevant and immaterial matters into the case to prejudice the jury. He failed to take the stand after the State had closed its case in chief.

The State was obliged to establish prima facie that the confession was freely and voluntarily made by the defendant. The evidence relative to this issue was primarily for the consideration of the court. When it held that a prima facie case had been established and that the confession was admissible in evidence, it still remained for the jury to determine whether the confession was voluntary or not and the weight to be

given it. In the consideration of the voluntariness of the confession, the jury was entitled to know all the facts and circumstances surrounding its execution and had a right to consider the credibility of the witnesses: *State v. Stevenson,* supra; *State v. Morris,* supra; *State v. Roselair,* supra; *State v. Spanos,* supra.

When defendant testified that he was tortured by an electric appliance or "truth tester" and that it had caused scars on his arm which he exhibited to the jury, it was not only proper to cross-examine him about such matter but to refute his testimony by calling J. S. Murray, chief clerk in the identification office at the Oregon state penitentiary, who testified that these same scars were on defendant's arm when he was "dressed in" at the penitentiary in January, 1929. Likewise, when the defendant testified that "Mr. Van Vactor took a knife and cut me under the fingernails. He said 'I'm going to show you a trick with holes in it' and cut me under all my finger-nails", the State was not bound to remain silent but had the right to refute this story. In so doing, the defendant was not being impeached upon a collateral matter.

The defendant Jordan, who requested the privilege of testifying in the presence of the jury, also brought out in his direct examination his previous conviction in California and claimed that he was shot by Chandler while he was in jail at Dunsmuir, before he was taken to San Quentin. Did the State not have the right to refute this testimony and to cross-examine the defendant? Was the State bound to remain silent and let the defendant undertake to show that he was "railroaded" to the penitentiary? As well stated by Mr. Justice Bean in the opinion on original hearing:

"If the charges of force and violence by the same officers in the previous prosecution were permitted to

go unchallenged to the jury, it would, in effect deny the state the right to show that the confession in the instant case was voluntary, and the right to show the circumstances surrounding the obtaining of the confession so that the jury could correctly determine the weight and credibility to be given the confession.''

In all the argument of counsel for appellant relative to the cross-examination of defendant concerning his commission of other crimes, they fail to take cognizance of the fact that Jordan brought these matters to the attention of the jury. In *State v. Stilwell,* 109 Or. 643 (221 P. 174), it is said:

"Under our statute, upon the trial of criminal action a defendant who elects to testify in his own behalf waives the constitutional protection guaranteed by Article I, Section 11, Constitution of Oregon, as to all matters germane to the facts to which he has testified upon his examination in chief: State v. Deal, 52 Or. 568-570, (98 Pac. 165). In the cross-examination of a defendant in a criminal action, the state should not be held to a rigid rule which would restrict the cross-examination, so as to prevent inquiry as to any matters which would throw light upon the testimony given in chief and germane thereto. Subject to the limitation that the cross-examination shall pertain to the testimony given upon the examination in chief the accused subjects himself to the same liabilities on cross-examination as do other witnesses: Wharton Crim. Ev. § 430. The prosecutor is not required to frame his questions in the language used by counsel upon the examination in chief. The inquiry upon cross-examination may extend to facts and circumstances apparently germane to the facts testified to in chief. Such cross-examination may be as searching and broad as the foundation upon which it rests.''

The scope of the cross-examination in the instant case was considered carefully in the original opinion (*State v. Jordan,* supra). We adhere to the law in this respect as declared therein.

Since it was ultimately for the jury to determine the voluntariness of the confession and as Jordan had testified concerning such issue, it was proper for the State to impeach his credibility by showing that he had been convicted of crime: *State v. Goodloe,* 144 Or. 193 (24 P. (2d) 28) ; *State v. Gilbert,* 138 Or. 291 (4 P. (2d) 923), and numerous authorities cited therein. Also see exhaustive note 6 A. L. R. 1626. When Jordan took the stand he placed in issue his credibility as a witness.

■ As the confession was a part of the State's case in chief, what difference did it make whether such impeachment came before or after the introduction of the confession in evidence? It was not error to offer evidence relative to the confession after it was received in evidence. Did the State not have the right to strengthen its prima facie case? In what way was defendant prejudiced? The order of proof rested in the discretion of the court.

■ No exceptions whatever were taken by counsel for defendant relative to the instructions of the trial court. Neither have they complained about the same either in oral argument or in their printed briefs. Apparently they were satisfied that the issues and the law of the case had been clearly and accurately stated. However, it is now urged for the first time that the judgment of conviction should be reversed because the court erred in giving the following instruction:

"Although the confession of the defendant, which was properly received in evidence, admitted not only the fact of the killing but also facts tending to show that the act was committed by him with such deliberation and premeditation as to constitute murder in the first degree, yet, that is not conclusive on the defendant. The accused is not estopped to deny and disprove the statements in this confession. He may show, when he confessed, that his confession was not voluntary.

The rule that a confession is to be considered in its entirety does not compel the jury to give the same belief to every part of it. The jury may attach such credit to any part of it as they deem it worthy of, and may reject any portion of it which they do not believe. All of it must be carefully weighed by the jury, and upon all the circumstances surrounding the case they must determine how much of it they will receive and how much of it they will reject.

"The competency of the evidence is, however, for the Court, while the weight and credibility of a confession as evidence are to be determined by the jury upon the same principles that they determine the weight and credibility of any evidence; that is, upon the consideration of all the circumstances connected therewith.

"Subject to the control of the Court, you are the exclusive judges of the effect or value of evidence addressed to you. However, your power of judging of the effect of evidence is not arbitrary but is to be exercised with legal discretion and in subordination to the rules of evidence. * * *"

It is asserted, in effect, that the trial court, in the giving of the above instruction, shifted the burden of proof to the defendant. We do not so construe it. The court was not talking about the burden of proof but was advising the jury that, although the confession had been admitted in evidence, the weight to be given to it, or to any part of it, remained ultimately for the determination of the jury. The instruction was taken almost verbatim from *State v. Blodgett,* 50 Or. 329 (92 P. 820), wherein the court said:

"Although the confession of defendant, which was properly received in evidence, admitted not only the fact of the killing, but also facts tending to show that the act was committed by him with such deliberation and premeditation as to constitute murder in the first degree, yet that is not conclusive upon defendant. 'The accused is not estopped to deny and disprove the statements in his confession. He may show that when he

confessed he was intoxicated, and may disprove by independent evidence of any sort any incriminating fact confessed by him. The rule that a confession is to be considered in its entirety does not compel the jury to give the same belief to every part of it. The jury may attach such credit to any part of it as they deem it worthy of, and may reject any portion of it which they do not believe. All of it must be carefully weighed by the jury and upon all the circumstances surrounding the case they must determine how much of it they will receive and how much of it they will reject': 12 Cyc. 484. The competency of the evidence is, however, for the court, while the weight and credibility of a confession as evidence are to be determined by the jury upon the same principles that they determine the weight and credibility of any evidence; that is, upon the consideration of all the circumstances connected therewith. * * * "

It has ever been the law in this jurisdiction that the State has the burden of showing that the confession was voluntarily made. *State v. Blodgett* is not to the contrary and has never been impliedly or expressly overruled by *State v. Howard,* 102 Or. 431 (203 P. 311), or *State v. Morris,* supra.

However, even had the instruction in question not been clear, the matter of burden of proof is concisely covered in the following instruction given by the court:

"You are instructed in this case that the defendant is not required to prove himself innocent for the reason that he is, at the outset of the trial, presumed to be an innocent man, and this presumption goes with him throughout the entire trial and stands as a shield to protect him, unless the state has proven to your satisfaction and beyond a reasonable doubt each and every material allegation of the indictment, and, therefore, the truth of the charge; and in this case *the burden of proof never shifts,* for the reason that the

defendant has entered a plea of not guilty, which puts in issue every material allegation of the indictment.''

█ It is argued, but not by counsel for defendant, that since Sullivan was still alive at the time the alleged confession was made in June, 1932, the defendant therefore did not confess to the crime charged in the indictment. No citation of authority is given to support this contention. Defendant undoubtedly was responsible for the consequences of his unlawful act. If his signed statement is true, the defendant deliberately and premeditatedly planned to rob Sullivan and, in order to accomplish the same, struck him several times over the head with a piece of water pipe. As a result of this unlawful attack Sullivan died. What difference does it make, so far as the essential elements of the crime are concerned, whether Sullivan was killed instantly or died several months later as a result of this unlawful assault?

█ It is not assigned as error in the briefs, but is nevertheless urged, that the trial court erred in failing to instruct the jury that evidence relating to the character of the defendant should be considered only by it in determining the credibility to be given defendant's testimony. No request was made for such instruction. The authorities cited in support of the above contention are cases wherein the court failed to give requested instructions. This court has never held it to be incumbent upon the trial court to give such an instruction unless requested so to do.

It has been established beyond a reasonable doubt that Jordan is guilty as charged. His confession of guilt rings true. The evidence strongly corroborates the recital of facts as made by the defendant in his confession. No member of this court has argued to the contrary. It is not contended by my brothers on the

bench that Jordan was subjected to abuse and mistreatment. Yet error is urged, not assigned in the briefs nor advanced by counsel for defendant in oral argument, as ground for reversal of the judgment. In a long line of decisions beginning with the leading case of *Kearney v. Snodgrass,* 12 Or. 311 (7 P. 309), this court has adhered to the guiding principle, "that it is not error simply, but error legally excepted to that constitutes ground for reversal". In *State v. Kelley,* 118 Or. 400 (247 P. 146), a case involving capital punishment, the court, in referring to *Kearney v. Snodgrass,* supra, said, "That case is firmly implanted in our jurisprudence as a guiding principle and has never been disturbed from that date to this. We must, therefore, decline to consider exceptions not embodied in the bill". To avoid the force and effect of these decisions, however, Rule 12 of this court is invoked, which provides that, "* * * The court reserves the right in furtherance of justice to notice on its own initiative a plain error of law apparent on the face of the record". We inquire where, in the instant case, is the plain error of law which would justify the application of this rule? The object and purpose of the rule is clearly stated in *State v. Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290). We see no reason to invoke it in the case at bar, for we are convinced there has been no miscarriage of justice.

Other assignments of error have been previously considered to our satisfaction in the opinion on original hearing, and we see no need to restate the law applicable thereto.

Finding no error prejudicial to the rights of the defendant, it follows that the judgment of conviction is affirmed.

KELLY, J., dissents.