PEOPLE *v.* HARPER.

1. Arrest—Without Warrant—Evidence.

Evidence as to information police officers had at time of making arrest, without a warrant, of defendant for illegal possession of a narcotic drug *held,* sufficient to justify trial court's determination that arrest was valid, such officers being empowered to make an arrest without a warrant upon reasonable cause to believe that a felony has been committed and that the person arrested has committed it (CL 1948, § 764.15).

2. Same—Without Warrant—Probable Cause—Evidence—Third Parties.

Whether or not a police officer has probable cause to effect the arrest of a person without a warrant because he believes such person has committed a felony is measured by circumstances existing at the time of the arrest, including the actions of third parties present, from which the arresting officer is entitled to draw reasonable inferences (CL 1948, § 764.15).

3. Searches and Seizures—Arrest.

A police officer may search a person after he is lawfully arrested for commission of a felony (Const 1908, art 2, § 10, as. amended).

4. Same—Automobiles—Narcotic Drugs.

The search of defendant's car after his arrest for illegal pos-- session of a narcotic drug was not unreasonable, where he dis-

---

References for Points in Headnotes

[1] 4 Am Jur, Arrest §§ 5, 25, 48.
[2] 4 Am Jur, Arrest § 48.
[3–5] 47 Am Jur, Searches and Seizures § 19.
Search and seizure incident to arrest without warrant.    82 ALR 782.
[6] 3 Am Jur, Appeal and Error § 838.
[7] 20 Am Jur, Evidence § 499.
Confessions as affected by delay in arraignment.    19 ALR2d 1331.
[8, 9] 50 Am Jur, Statutes §§ 238, 413.
[10, 12, 13] 17A Am Jur, Drugs and Druggists § 34.

closed after the arrest that the car contained marijuana and
car keys on his person at time of arrest were used to unlock
car trunk (Const 1908, art 2, § 10, as amended; CL 1948,
§ 764.15).

5. SAME—TEST OF REASONABLENESS.

The reasonableness of the search of a car belonging to one ar-
rested on charge of the illegal possession of a narcotic drug
must be determined as of the time of the search and considera-
tion given to information obtained by the searching officer as
a result of the arrest and as a result of any other lawful
searches, including information obtained from the person ar-
rested (Const 1908, art 2, § 10, as amended; CL 1948, § 764.15).

6. APPEAL AND ERROR—QUESTIONS REVIEWABLE—ARREST—SEARCHES
AND SEIZURES—NARCOTIC DRUG.

Whether or not proviso of search and seizure clause of State
Constitution, permitting use in evidence in any criminal pro-
ceeding of narcotic drugs seized outside the curtilage, of a
dwelling is valid is not determined, where arrest for illegal
possession of a narcotic drug and ensuing search and seizure
of marijuana from defendant's automobile are both determined
to have been reasonable (Const 1908, art 2, § 10, as amended;
CLS 1956, § 335.153; CL 1948, § 764.15).

7. CRIMINAL LAW — ARREST — DELAY — ARRAIGNMENT — VOLUNTARY
· STATEMENTS.

Delay of about 12–1/2 hours between arrest, at 4:30 a.m., and
arraignment on charge of illegal possession of a narcotic drug
*held*, not reversible error as unduly prolonged, where there is
nothing in the record to indicate defendant's statements made
during such period were other than voluntary and the micro-
scopic examination and chemical analysis of the drug was not
completed until about 10 hours after the arrest (CLS 1956,
§ 335.153).

8. POISONS—ILLEGAL POSSESSION OF NARCOTICS—CONTROL—CON-
STRUCTION OF STATUTES.

The terms *possess* and *control*, as used in act prohibiting posses-
sion or control of narcotic drugs by unauthorized persons, are
construed in the light of the legislative purpose as expressed
by the broad scope of the statutory proscriptions, the nature
of the words used to describe the acts forbidden, and the legis-
lative separation of the concepts of *control* and *possession*, stat-
utory context of possession being pertinent, where defendant·
was convicted of possession, but not control, of a quantity of
marijuana (CLS 1956, § 335.153).

9. SAME — CONTROL — POSSESSION — NARCOTICS — CONSTRUCTION OF
STATUTES.

> Statute providing that "any person not having a license * * *
> who shall possess or have under his or her control any narcotic
> drug shall be deemed guilty of a felony" is construed as having
> used the terms *possession* and *control* in their commonly under-
> stood sense, and not in a restricted technical sense (CLS 1956,.
> § 335.153).

10. SAME—POSSESSION OF MARIJUANA—PHYSICAL CONTROL—EVI-
DENCE.

> Possession of marijuana was established when it was shown de-
> fendant had physical control of it with the intent to exercise
> such control, or having had such physical control, has not
> abandoned it and no other person has that possession (CLS.
> 1956, § 335.153).

11. SAME—NARCOTICS—POSSESSION—CONTROL.

> *Possession* of narcotics, as proscribed by statute, is a term broad
> enough to include narcotics knowingly placed in the trunk of
> one's automobile; *control* of narcotics as forbidden by same
> statute being broad enough to include any right to direct dis-
> position of narcotics exercisable by any person whether or not
> the owner of the narcotics (CLS 1956, § 335.153).

12. SAME—NARCOTICS—ILLEGAL POSSESSION.

> The intended use to which narcotics are to be put does not relieve
> unlicensed possession from illegality (CLS 1956, § 335.153).

13. SAME—ILLEGAL POSSESSION OF MARIJUANA—EVIDENCE.

> Record showing defendant allowed another to place a suitcase
> containing about 8 pounds of marijuana in defendant's car,
> knowing that the suitcase contained marijuana, so that as they
> traveled to another city in the other person's car police would
> not find it in the event they were stopped during the nighttime,.
> *held*, sufficient to support conviction of illegal possession of a
> narcotic (CLS 1956, § 335.153).

Appeal from Ingham; Hughes (Sam Street), J.
Submitted October 12, 1961. (Docket No. 95, Calen-
dar No. 49,217.) Decided March 15, 1962.

John M. Harper was convicted of unlawful posses-
sion of a narcotic drug. Affirmed.

*Paul L. Adams* and *Frank J. Kelley,* Àttorneys General, *Joseph B. Bilitzke* and *Eugene Krasicky,* Solicitors General, *James R. Ramsey,* Assistant Attorney General, *Leo A. Farhat,* Prosecuting Attorney, and *Howard A. McCowan,* Assistant Prosecuting Attorney, for the people.

*Newman, Chamberlain, Jones & Mackay (Fred C. Newman,* of counsel), for defendant.

SOURIS, J. Defendant was convicted of possession of a narcotic drug in violation of section 3 of PA 1952, No 266 (CLS 1956, § 335.153, Stat Ann 1957 Rev § 18.1123):

"Any person not having a license * * * who shall possess or have under his or her control any narcotic drug shall be deemed guilty of a felony."

He was tried on an information in 2 counts, one charging unlawful possession of a narcotic (marijuana) and the other charging unlawful control of a narcotic. A jury found him guilty of the possession charge but not guilty of the control charge. A companion arrested with Harper pleaded guilty to both counts.

Questions raised by this appeal involve the legality of defendant's arrest and a subsequent search and seizure; determination whether there was an unnecessary delay between arrest and arraignment; and determination whether the evidence was sufficient to support his conviction. These questions were properly preserved for review by timely motions made before trial to suppress certain evidence and to quash the information and by motion made at the conclusion of the people's proofs for directed verdict of acquittal. Each motion was denied and defendant rested without submitting proofs in his defense.

From the proofs it appears that the State police had been investigating the activities of a William Reich, a suspected narcotics peddler. Sergeant Goodnuff, who arrested Reich and the defendant, testified at the hearing on the motions that he had been told by fellow officers conducting the investigation of Reich that Reich had a friend whose name was Mike; that Reich and Mike possibly lived together and played in an orchestra at an East Lansing restaurant; and that Mike's car had been seen frequently around Reich's apartment. During the evening preceding the arrests, Reich had delivered a quantity of marijuana to an undercover police agent. The agent and Sergeant Goodnuff, in plain clothes, went to Reich's apartment at about 4:30 the following morning to pay Reich for the marijuana and to effect his arrest. Reich and defendant Harper drove up to the apartment in Reich's car while the agent and Goodnuff were sitting in an unmarked police car waiting for Reich. Sergeant Goodnuff was introduced to Reich as a friend and Reich introduced defendant Harper to the agent and to the sergeant as his friend, Mike.

The 4 men then entered Reich's apartment. The living room, where all subsequent events leading up to the arrests occurred, was about 12 feet long and 8 or 9 feet wide. Sergeant Goodnuff feigned illness and sat on a bed, Harper sitting next to him. Reich and the agent stood near a doorway at the end of the room about 8 feet from the sergeant and a little closer to the defendant. Sergeant Goodnuff testified that he could hear the conversation between Reich and the agent and saw the agent hand Reich $50. Sergeant Goodnuff also heard Reich and the agent talk about where each had been during the night, Reich telling the agent that he and Harper had been to Ann Arbor "checking on whether our

friends got busted in Ann Arbor." He reported that "they were arrested for shoplifting instead" [*sic*].

After the money had changed hands, Sergeant Goodnuff announced to Reich and Harper that he and the agent were police officers and that they were under arrest. Other officers stationed in the area thereupon entered the apartment upon a signal given by the agent or the sergeant. Detective Cloonan was among the officers who entered. He testified at the preliminary examination that after searching Harper he had a conversation with him:

"*Q.* Will you please tell the court what this conversation was?

"*A.* I asked Mr. Harper where the rest of the marijuana was and he told me it was in the trunk of his automobile.

"*Q.* Did he refer to it in any specific manner?

"*A.* He said the stuff was in the trunk of his automobile. I asked him what he meant by stuff and he stated: marijuana. I asked him if he knew it was marijuana when it was put in the trunk of the car and he said that he did."

Harper's car, which had been parked in a lot near Reich's apartment, was searched. Its trunk was opened with a key taken from Harper during his search and in it was a suitcase. The suitcase was opened with a key taken from Reich. It contained about eight pounds of marijuana.

It was on the basis of the foregoing proofs the circuit judge was obliged to determine the validity of the defendant's arrest without a warrant. We believe he was correct in concluding the arrest was valid. CL 1948, § 764.15 (Stat Ann 1954 Rev § 28.874), permits peace officers to make an arrest without a warrant upon reasonable cause to believe that a felony has been committed and that the person arrested has committed it. What Sergeant Good-

nuff had reasonable cause to believe at the time of arrest is the pertinent subject of our inquiry.

Defendant leans heavily upon the sparcity of facts about Harper then known to the sergeant. He knew only that Harper was a friend of Reich, possibly a roommate; that they played together in an orchestra; and that Harper's car was seen frequently near Reich's apartment. This much the record discloses he knew about Harper before even meeting him, but not to be overlooked is what he learned, or had reasonable cause to believe, about Harper immediately before the arrest. He knew, because he heard Reich tell the undercover agent, that Harper had accompanied Reich to Ann Arbor that evening to check on some friends who had been arrested. He knew that the trip was taken after the undercover agent had received delivery of marijuana from Reich for which Reich expected to be paid at the time of the arrests. We think he was entitled to infer that, under such circumstances, Reich hardly would be at that time in the company of Harper if Harper were not also involved in Reich's illegal activity. Add to that, Harper's presence within viewing and hearing distance when Reich received payment for the marijuana from the undercover agent and nothing could be more reasonable than belief in Harper's complicity with Reich. We measure this belief by circumstances existing at the time of arrest and included among the circumstances to be considered are the actions of third parties present from which the arresting officer is entitled to draw reasonable inferences. This is not to suggest that mere presence with a felon at the time of his arrest subjects one to arrest also, but it does suggest that we will not isolate facts or beliefs from their surrounding circumstances in determining the existence of what has come to be called probable cause for arrest without a warrant.

Its existence depends in every case upon the peculiar circumstances confronting the arresting officer. *People* v. *Orlando,* 305 Mich 686, 689. He makes his determination, and we review it, not as a legal scholar determines the existence of consideration in support of a promise, but as a man of reasonable prudence and caution would determine whether the person arrested has committed a felony. See *Hammitt* v. *Straley,* 338 Mich 587, and the cases referred to therein.

The search of defendant following his arrest must likewise be upheld as not unreasonable within the constitutional meaning of that term. Article 2, § 10, Constitution (1908).* This Court has held that an officer may search a person after he is lawfully arrested for commission of a felony. *People* v. *Licavoli,* 245 Mich 202. In the case at bar the search produced nothing more significant at the moment than a set of car keys. The keys acquired substantial significance moments later, however, when defendant told the officers present, in response to their questioning, that there was marijuana in the trunk of his car. Based upon this admission by defendant after his arrest, we hold the subsequent search of defendant's car to have been reasonable. *People* v. *Orlando, supra.* Quoting *People* v. *Gonzales,* 356 Mich 247, at 253, defendant argues that even if his arrest be upheld as legal, the subsequent search of his car is not automatically rendered constitutional. Of course he is right in this, but nothing said in *Gonzales* or in any other case about which we know requires that determination of the reasonableness of a search subsequent to arrest be limited to circumstances as they were known to exist at the time of arrest. The reasonableness of the search must be

* This section was amended to add a proviso in 1936. The proviso was amended with reference to narcotic drugs in 1952. See PA 1953, p 438.—REPORTER.

determined as of the time of search and consider-
ation must be given to information obtained by the
searching officer as a result of the arrest and as a
result of any other lawful searches. Certainly the
admissions made by Harper himself are sufficient to
support the reasonableness of the search of his car.

Had we concluded that the search of defendant's
automobile was constitutionally unreasonable, we
would have been obliged to consider whether the
proviso clause of article 2, § 10, Constitution (1908),
has continuing vitality in the light of the decision
rendered last year by the United States supreme
court in *Mapp* v. *Ohio,* 367 US 643 (81 S Ct 1684,
6 L ed 2d 1081). However, having concluded that
the search of the car was reasonable, the marijuana
found therein was admissible in evidence without
necessitating reliance upon the questioned proviso
clause which would have authorized its admission
(at least before the *Mapp Case*) even if the search
and its seizure had been unreasonable. *People* v.
*Gonzales,* 356 Mich 247, 258–265. Having reached
the conclusion we have, the effect of *Mapp* on section
10 of article 2 of our Constitution will have to be
left for determination in another case at another
time.

We turn now to defendant's "Hamilton argument."
*People* v. *Hamilton,* 359 Mich 410. Harper and
Reich were arrested shortly after 4:30 in the morn-
ing.* Their presentation before a magistrate for
arraignment occurred about 12–1/2 hours later at
about 5 in the afternoon of the same day of arrest.
In the interim the suitcase of marijuana was de-
livered to the State police scientific crime detection
laboratory at 8 in the morning for microscopic

---

* Of May 22, 1959.—REPORTER.

examination and chemical analysis.* The defend-
ant was taken to the prosecutor's office at 3 in the
afternoon where he signed a confessional statement
and was then taken to the magistrate for arraign-
ment.

From the evidence presented to Judge Coash in
support of defendant's motions to suppress and to
quash, including the testimony offered at the pre-
liminary examination, nothing appears to indicate
the defendant's admissions and his confessional
statement were other than voluntary. The evidence
was ample to support such a finding and there was
no evidence to rebut it. None of the circumstances
which so strongly compelled our finding Hamilton's
confession was involuntary is present in the case at
bar. Nothing in this record suggests that the delay
of 12-1/2 hours between arrest and arraignment
was for the "manifest purpose  *  *  *  of 'sweating'
a confession" from defendant, as we found the pur-
pose to be of Hamilton's prolonged detention. 359
Mich at 416.

One final question remains: Were the proofs of-
fered by the people sufficient to support defendant's
conviction of possession of a narcotic in violation
of section 3 of PA 1952, No 266? If not, defendant's
motion for directed verdict of acquittal made at the
conclusion of the people's case should have been
granted by Judge Sam Street Hughes, before whom
the case was tried.

Michigan's statutes pertaining to narcotics are,
like those of most States, the result of legislative
trial and error efforts to deal with a social problem
of major significance. As a consequence, legislative,
enactments have been many, some attempting only;

---

* From testimony elicited at the trial, but not at the preliminary·
examination or at the hearing on the defendant's motion to suppress,,
it appears that the microscopic examination was completed in the·
morning and the chemical analysis by midafternoon.

patchwork amendment of existing law, others repealing existing law and substituting a new enactment. Michigan's version of the uniform narcotic drug act has not escaped the frequent amendments which make many of such acts throughout the country virtually unrecognizable to the commissioners on uniform State laws who expressed the forlorn hope that their handiwork, wherever enacted, would be "so interpreted and construed as to effectuate its general purpose, to make uniform the laws of those States which enact it." Uniform narcotic drug act, section 23, 9B ULA, pp 275, 332. See, also, section 24, PA 1937, No 343 (CL 1948, § 335.74 [Stat Ann 1957 Rev § 18.1094]). In Michigan, now, the "uniform" act (PA 1937, No 343) applies only to those "duly licensed" under that act and PA 1952, No 266, for violation of which defendant was convicted, applies to any person not so licensed. The legislature, however, has specifically provided, in section 7 of Act No 266 (CLS 1956, § 335.157; Stat Ann 1957 Rev § 18.1127), that it be construed as supplemental to and in conjunction with other laws of the State and of the United States dealing with narcotics.

Specifically, our problem is to determine the meaning of the words "who shall possess or have under his or her control," as used in section 3 of the act and as more fully quoted at the beginning of this opinion. It will be remembered that defendant was acquitted by the jury of having narcotics "under his control," but convicted of having them in his possession.

Earlier in the history of Michigan's effort to control traffic in narcotics, only "possession for sale, giving away, dispensing or distribution" was proscribed. PA 1923, No 92, later amended by PA 1925, No 9, to eliminate reference to the purpose of possession. Today, as it has been since the 1925 amend-

ment, unauthorized possession for any purpose is prohibited.* Thus, we need not concern ourselves with what Harper intended to do with the marijuana, for the legislature does not permit us to draw the line between legal and illegal activity by reference to the purpose of possession. We are required only to determine whether Harper had possession of the marijuana.

We have never had occasion to determine the meaning of possession, as that word is used in PA 1952, No 266. Does it mean only actual manual custody, while control connotes what we know in the law as constructive possession, as defendant would have us say? Or does it mean something else? We approach this task keeping in mind the legislative purpose as expressed by the broad scope of the statutory proscriptions, the nature of the words used to describe the acts forbidden, and the legislative separation of the concepts of control and possession. In determining the meaning of possession, its statutory context is pertinent.

Here, we are construing an act regarding a multitude of activities the legislature has demonstrated a substantial purpose to regulate by license or to eliminate by penal sanctions. It forbids, not only unlicensed possession or control of narcotics, but also selling, manufacturing, producing, administering, dispensing or prescribing narcotic drugs. In this act the legislature has spoken in broad, all embracing proscriptive language forbidding even possession for personal consumption or use.

It is further significant that the acts forbidden are described in words without peculiar and re-

---

* See PA 1929, No 310 (CL 1929, §§ 9212–9234); PA 1931, No 172 (CLS 1935, § 9234–1 *et seq.*; Stat Ann § 18.1041 *et seq.*); PA 1937, No 343, as amended (CL 1948 and CLS 1956, § 335.51 *et seq.*; Stat Ann 1957 Rev and Stat Ann 1961 Cum Supp § 18.1071 *et seq.*). Each act prohibited illegal possession of narcotic drugs.—Reporter.

stricted legal meanings. They are words used in daily speech, understood by laymen in whatever occupation, and not just by lawyers. Each of the following words has a common meaning not altered by its use in reference to narcotics: *selling, manufacturing, producing, administering, dispensing,* and *prescribing.* That the legislature used the words "possession" and "control" also in their commonly understood sense, and not in a restricted, technical sense, is apparent from the language used to describe the other acts similarly forbidden.

Finally, we are bound to note that our legislature consistently has separated the concepts of possession and control whenever those words are used in legislation dealing with narcotics. Possession, as it is known and used in its technical legal meaning in other areas of the law, is frequently described in terms of the control exercised by the possessor. For an interesting discussion of the elusive technical meaning of possession and the significance of the element of control in its technical definition, see 72 CJS, Possession, p 233.

For example, in California, where the narcotics statute does not make control, as well as possession, a separate crime, possession (in narcotics cases) is defined as:

" 'Possession' of a chattel is established when it is shown that a person has physical control thereof with the intent to exercise such control, or having had such physical control, has not abandoned it and no other person has that possession (1 Restatement, Torts, § 216)." *People* v. *Bassett,* 68 Cal App2d 241, 247 (156 P2d 457, 460).

This definition was followed in *People* v. *Johnston,* 73 Cal App2d 488 (166 P2d 633) ; *People* v. *Gory,* 28 Cal2d 450 (170 P2d 433) ; *People* v. *Rumley,* 100 Cal App2d 6 (222 P2d 913) ; *People* v. *Martinez,* 117 Cal

App2d 701 (256 P2d 1028) ; and *People* v. *Toms,* 163
Cal App 2d 123, 127 (329 P2d 90, 93), where the court
said:

"Knowledge of the presence of the object as em-
braced within the concept of physical control with
the intent to exercise such control is the essence of
the possession announced by the narcotic statute."

Because possession and control are made separate
offenses under the Michigan act, it is quite evident
that the possession forbidden is not that possession
we know in the law of property, or of torts, which is
described technically in terms of control or its
equivalent.

These considerations lead us to conclude that the
possession of narcotics forbidden by the Michigan
act is broad enough to include narcotics knowingly
placed in the trunk of one's automobile as well as
narcotics held in one's hands. The control of nar-
cotics forbidden by the act without qualifying lan-
guage, is broad enough to include any right to direct
disposition of narcotics exercisable by any person,
whether or not the owner of the narcotics. By so
construing these terms, the purposes of the act as
we discern them, and particularly section 3 thereof,
are given full effect. Not only does the act reach
the actual peddler of narcotics who carries his stock
in trade in hand or secretes it, but it reaches the
kingpin of the narcotics traffic who controls its dis-
position but never himself possesses the stuff.

The defendant also makes the claim that he cannot
be convicted of possessing narcotics in the absence
of any proof of his intention to possess narcotics in
the sense of using them, selling them or otherwise
disposing of them. As we have previously noted, no
longer does the intended use to which narcotics are
to be put relieve unlicensed possession from ille-
gality. The intent essential to defendant's convic-

tion is his intent to possess narcotics, not what he thereafter intends to do with the narcotics. The record clearly discloses Harper intended to possess the marijuana here involved.

The proofs offered at defendant's trial disclosed that Reich and Harper were going to drive to Ann Arbor in Reich's car during the evening preceding their arrest. The suitcase containing marijuana was in the trunk of Reich's car and, at his request, Harper allowed him to put the suitcase in Harper's car trunk so that, in the event they were stopped by the police during their journey in Reich's car, the marijuana would not be found. This is what the record before us discloses Harper told the police officers at the time of his arrest and it is repeated in the signed statement he gave to the prosecutor before his arraignment. The marijuana was placed in Harper's car with his consent, with his knowledge that it was marijuana, and with his intent that it be placed there to aid and abet Reich in his efforts to avoid police detection of its unlawful possession.* Under these circumstances, we cannot conclude other than that the record amply supported Harper's conviction.

Affirmed.

Dethmers, C. J., and Carr, Kelly, Black, Kavanagh, and Otis M. Smith, JJ., concurred.

Adams, J., took no part in the decision of this case.

---

* Although not involved in the trial of this case, nor in this appeal, there is a suggestion in the people's brief that under these facts Harper was an accessory. See CL 1948, § 767.39 (Stat Ann 1954 Rev § 28.979).