Argued June 6, affirmed October 10, petition for rehearing
denied November 7, 1962

## STATE OF OREGON *v.* SHIPLEY
375 P. 2d 237

*Eugene K. Richardson,* Newport, argued the cause and submitted briefs for appellant.

*A. R. McMullen,* District Attorney, Newport, argued the cause for respondent. With him on the brief was R. P. Everhart, Deputy District Attorney, Newport.

Before McALLISTER, C. J., and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

McALLISTER, C. J.

The defendant, Larry West Shipley, was convicted of murder in the first degree by a jury which did not recommend life imprisonment. The mandatory death sentence was imposed and this appeal was taken automatically pursuant to ORS 138.410–138.430.

■ The defendant's assignments of error are all based on his contention that there was unreasonable delay in taking him before a magistrate, and that the admissions and confessions made by defendant during such delay should have been excluded from evidence.

At about 3:45 p. m. on Tuesday, August 8, 1961, the bullet-riddled body of a 16-year-old girl, Linda Stevens, was found lying on a forest path in Lincoln county, just off the highway a few miles north of Otis Junction. It appears from the evidence that Linda was a ward of the juvenile court, had been living with foster parents in McMinnville and was acquainted with the defendant Larry Shipley. Shipley was then 20 years of age, was on parole from the Oregon Correctional Institution, was living with his parents in McMinnville, and was employed as a hospital orderly.

Shipley, accompanied by his friend Glen Dixon, met Linda by prearrangement in the city park in Mc-

Minnville at about 11:45 p. m. on Sunday evening, August 6, 1961. Linda told Larry that her foster mother had heard her leave home by a window and that if she returned home she would be sent to Hillcrest, a girls' correctional school. Linda said she would not return home but intended to run away and asked Larry to help her. In response to her request the men drove her in Dixon's car into the hills behind Willamina, near a place where Linda had formerly lived with her own parents. During the trip both men had intercourse with Linda, Shipley while riding in the car and Dixon at a stop made enroute in the Eola Hills.

On the way back to McMinnville Shipley told Dixon that if Linda was found she would probably tell the police that the two men had helped her run away or had raped her. Dixon asked Shipley what they should do and Shipley said "maybe we'd better kill her." After further talk the men decided to return the next night and to kill Linda if she was still there. The men got back to McMinnville at about 3:45 o'clock a. m. on Monday, August 7, 1961. Shipley went to work at 7:00 o'clock a. m., and when he was through work at 3:00 p. m. was picked up by Dixon.

The men went to Dixon's home to get a shovel with which to dig a grave for Linda, and then went to a service station where Shipley bought a box of 22 shells with which to do the killing. The shells were to be used in a revolver owned by Dixon. The men next drove in Dixon's car into the Eola Hills and started to dig a grave, but after digging a while decided the ground was too hard and returned to McMinnville. They replaced a broken axle in Shipley's car and then drove in that car to the spot where they had let Linda out during the early hours of the same day. Linda,

who apparently had been waiting for them, got into the car and with Shipley driving they started toward the coast. The men had decided that it would be easier to bury the body in the sand dunes along the coast and were headed toward Pacific City.

A few miles north of Otis Junction the car began to make a scraping sound and Shipley told Dixon they had better stop. Dixon directed Shipley to turn around and drive back a short distance to a turn-out along the road from which a path led up the wooded hillside. Dixon told Linda that he knew of a cabin in the woods where she could stay. Dixon carrying a flashlight led the way up the path, followed by Linda who was followed in turn by Shipley. After walking a few hundred yards Shipley told Dixon to stop. Linda was facing up the hill and Shipley stepped up behind her, placed the revolver to the back of her head and pulled the trigger. Linda fell and Shipley emptied the gun by firing the rest of the shells into her head and body and then ran down the hill to the car. Shipley and Dixon returned directly to McMinnville, arriving about 10:45 p. m. Shipley dropped Dixon off at his parked car, and then went home.

Although Linda was murdered about 9:30 o'clock p. m. on Monday, August 7, 1961, her body was not found until the next day, Tuesday, August 8, at about 3:45 o'clock in the afternoon. The scene of the crime was in Lincoln county and the body was taken to Newport, the seat of that county. The body was not identified with certainty until about 9:30 o'clock that night, at which time the investigation shifted to McMinnville in Yamhill county.

At about 11:30 p. m. on Tuesday, August 8, 1961, Officer Carpenter of the Oregon State Police went to Shipley's home, asked Shipley when he had last seen

Linda Stevens, told him the police were making a pre-
liminary investigation, and asked Shipley if he would
come to the office and talk to them. Shipley agreed
and was taken by Officer Carpenter and a deputy
sheriff to the Yamhill county courthouse in McMinn-
ville. Glen Dixon also was taken to the courthouse
in the same car. According to Shipley he arrived at
the courthouse at about ten minutes before midnight.

At the courthouse Shipley waited in a room alone
for about 30 minutes and then was taken by Corporal
Finney of the Oregon State Police into the sheriff's
private office where Corporal Finney talked to him
for about 45 minutes. Thereafter Shipley was inter-
rogated intermittently by various officers of the State
Police, parole officer Dan Hyatt, and Sheriff W. L.
Mekkers of Yamhill county, until about 5:50 a. m.,
when Shipley was put to bed in a part of the jail known
as the sickbay.

Shipley, as a witness, gave a detailed chronological
account of his questioning and all events that occurred
during his stay at the courthouse in McMinnville. He
explained his accurate knowledge of the chronology
of events by saying that he had a habit of looking at
his watch.[1]

After he had slept for about four hours Shipley
was awakened at 9:50 a. m. and taken to the sheriff's
office where he was questioned for about an hour. He
then returned to his cell in the sickbay and went back
to sleep. At about 11:30 a. m. Shipley was again
awakened and taken to the sheriff's office. At 12:00

[1] "Q  Do you have any recollection of when you arrived at the
sheriff's office?

"A  See—it was either a quarter or ten minutes to twelve
Standard Time; it was actually a quarter or ten minutes to one
o'clock Daylight Time, because I was looking at my watch quite
a bit; which I have a habit of doing."

noon he began to give a statement to a court reporter in the presence of the sheriff and several officers. Shipley, in response to questioning, confessed that he and Dixon had killed Linda, although he insisted that Dixon had done the shooting. He was returned to his cell about 1:30 p. m. and was given lunch, consisting of a sandwich and soft drink.

About 2:00 o'clock p. m. Shipley went in a car with several officers and showed them the place in the Eola Hills where he and Dixon had started to dig the grave. Shipley was returned to his cell at about 3:30 p. m., where he remained until about 7:30 p. m. During this interval he was given supper.

At about 7:30 p. m. Shipley was taken to the office of a deputy sheriff where he was again questioned and asked to read the transcript of the statement given by him to a court reporter earlier in the day. Shipley read and initialed the first nine pages. He then stated that the remainder of the statement was inaccurate and offered to write a corrected statement for the officers. Defendant then spent the next hour and a half writing a detailed confession in which he admitted that he had personally fired the shots that killed Linda. The statement was completed and signed at about 9:30 o'clock p. m.

At about 10:00 o'clock p. m. the officers put Shipley in a car and started for Newport. Enroute Shipley showed the officers the place near Willamina to which he and Dixon had taken Linda on the night before the killing. He also pointed out to the officers the path leading from the highway on which the killing had occurred. The group arrived in Newport shortly after midnight and Shipley was arraigned before a Justice of the Peace at about 12:50 a. m. on Thursday, August 10, or about 25 hours after he had been taken

for questioning to the Yamhill county courthouse a few minutes before midnight on August 8th.

Defendant objected to the introduction into evidence of the admissions and confessions made by him during the period of his detention in the Yamhill county jail at McMinnville. In support of his contention that the court erred in admitting these admissions and confessions into evidence defendant relies on the rule adopted by the federal courts that a confession made during a period of illegal detention is inadmissible. *McNabb v. United States,* 318 US 332, 63 S Ct 608, 87 L Ed 819 (1943); *Upshaw v. United States,* 335 US 410, 69 S Ct 170, 93 L Ed 100 (1948); *Mallory v. United States,* 354 US 449, 77 S Ct 1356, 1 L Ed2d 1479 (1957).

ORS 133.550 requires that "the defendant shall in all cases be taken before a magistrate without delay." ORS 133.610 directs the magistrate to inform the defendant "of the charges against him and of his right to the aid of counsel before any further proceedings are had."

There is doubt as to just when defendant was first placed under arrest and when the police first acquired sufficient information to justify charging defendant with the murder of Linda Stevens. It is conceded in the defendant's brief that it was not until about noon on August 9, 1961 "that the investigating officers had any reason to believe defendant was implicated" in the murder. Taking that view it is obvious that the defendant could and should have been taken before a magistrate during the afternoon of Wednesday, August 9, 1961. The distance between McMinnville and Newport is about 76 miles and defendant could have been taken before a magistrate in either county.

The McNabb-Mallory rule is not based on a con-

stitutional ground but on the supervisory power of the Supreme Court "over the procedure and practices of federal courts in the trial of criminal cases." *Gallegos v. Nebraska,* 342 US 55, 63-64, 72 S Ct 141, 146, 96 L Ed 86 (1951).

■ The admission of a voluntary pretrial confession does not violate due process. *Gallegos v. Nebraska,* supra, 342 US 55, 65; *Lisenba v. California,* 314 US 219, 238, 62 S Ct 280, 86 L Ed 166 (1941); *Chambers v. Florida,* 309 US 227, 236-238, 60 S Ct 472, 84 L Ed 716 (1940); *Brown v. Mississippi,* 297 US 278, 285-286, 56 S Ct 461, 80 L Ed 682 (1936).

It is clear that the McNabb-Mallory rule is not applicable to the trial of criminal cases in state courts. In *Culombe v. Connecticut,* 367 US 568, 81 S Ct 1860, 6 L Ed2d 1037 (1961), the Supreme Court said:

> "The *McNabb* case was an innovation which derived from our concern and responsibility for fair modes of criminal proceeding in the federal courts. The States, in the large, have not adopted a similar exclusionary principle. And although we adhere unreservedly to *McNabb* for federal criminal cases, we have not extended its rule to state prosecutions as a requirement of the Fourteenth Amendment. [Citing cases]"

This court has declined to adopt the McNabb-Mallory rule. See *State v. Nunn,* 212 Or 546, 553, 321 P2d 356 (1958); *State v. Leland,* 190 Or 598, 227 P2d 785 (1951), aff'd 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952); *State v. Folkes,* 174 Or 568, 587, 150 P2d 17 (1944), cert. denied 323 US 779, 65 S Ct 189, 89 L Ed 622 (1944).

The McNabb-Mallory rule apparently has not been adopted in any state. Michigan seemed to adopt the rule in *People v. Hamilton,* 359 Mich 410, 102 NW2d

738 (1960), but that holding has been severely limited by subsequent cases. *People v. Harper,* 365 Mich 494, 113 NW2d 808 (1962); *People v. Hannum,* 362 Mich 660, 107 NW2d 894 (1961).

■ The only permissible test for determining the admissibility of a pretrial confession is whether it was freely and voluntarily made. As said by the Supreme Court in *Culombe v. Connecticut,* supra, at 602:

> "The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

Voluntariness is the test which has been consistently applied in this state. *State v. Nagel,* 185 Or 486, 518, 202 P2d 640, cert. denied 338 US 818, 70 S Ct 60, 94 L Ed 495 (1949); *State v. Jordan,* 146 Or 504, 510, 26 P2d 558, 30 P2d 751 (1934); *State v. Morris,* 83 Or 429, 163 P 567 (1917); *State v. Roselair,* 57 Or 8, 109 P 865 (1910).

■ Since *Rogers v. Richmond,* 365 US 534, 81 S Ct 735, 5 L Ed2d 760 (1961) the probable truth of a confession is no longer a relevant factor in determining its admissibility, and contrary implications in any of our former opinions must be deemed overruled. In passing on the admissibility of Shipley's confession in this case we have given no consideration to the element of reliability.

We turn then to the question controlling our decision in this case—was Shipley's confession given

freely and voluntarily? Neither as a witness in the trial court, nor in his brief in this court does the defendant contend that his confessions were not voluntarily given. In accordance with our practice, the trial judge heard the evidence bearing on the admissibility of the confessions without the presence of the jury. *State v. Nunn,* supra, 212 Or at 554. At this hearing the defendant testified in detail concerning his interrogation and treatment by the officers from the time he was picked up at his home in McMinnville near midnight on August 8, until he was arraigned at Newport shortly after midnight on Thursday, August 10, 1961. His testimony contains not the slightest criticism of the treatment afforded him by anyone at any time during this period. Although he was questioned intermittently by various officers, singly and in combination, from about 12:30 a. m. until about 5:50 a. m., he does not suggest that he was affected adversely in any degree by this questioning. During that period Shipley talked for about an hour and a half to Officer Shipman, which conversation he described as follows:

"Q Then what happened?

"A Well, Mr. Carpenter got up and left and Officer Shipman come in and sat down in his chair, and we just started batting the breeze about anything.

"Q This was general conversation?

"A Yes, it was just about my job and what I planned in the future; my education and such.

"Q How long did this carry on?

"A From approximately three or three-fifteen to four-thirty I imagine."

Shipley spent the last 35 minutes before he was put to bed in conversation with an officer whose identity

he could not recall. Concerning this conversation Shipley testified:

"* * * Mr. Hyatt left the room and an officer came back in; who it was I cannot recall, but he came back in and sat down for a while across the chair from me and just made small talk, nothing about that matter."

Shipley had been thrice convicted of burglary and once of car theft, and was on parole from the Oregon Correctional Institution. He was not unacquainted with police investigative procedure. His parole officer testified that he was of average intelligence for parolees, although a little below the average intelligence for men of his age.

■ The burden, of course, was on the state to prove the voluntariness of the confessions. The state offered abundant evidence from which the jury could find that Shipley's confessions were made freely and voluntarily. There was no evidence to the contrary. Under the circumstances the trial court did not err in admitting the confessions into evidence.

We have examined the record with care and are satisfied that the judgment of the trial court should be, and it is affirmed.

O'CONNELL, J., dissenting.

Defendant was under arrest when he was brought to the sheriff's office on the night of August 8, 1961. He was not taken before a magistrate until 12:55 a. m. on August 10th. ORS 133.550 provides that "[t]he defendant shall in all cases be taken before the magistrate without delay." The police disregarded this mandate. Their only purpose in doing so was to interrogate the accused. That is not a legal excuse for post-

poning the prompt presentment of an arrested person before a magistrate.

Under these circumstances, even assuming that defendant made the confession voluntarily, it was the product of an unlawful detention. I am of the opinion that we should apply the principles supporting the so-called McNabb-Mallory rule① and hold that any confession obtained in the course of violating ORS 133.550 is inadmissible.②

The confession should, therefore, be rejected and the cause remanded for a new trial.

SLOAN, J., joins in this dissent.

GOODWIN, J., specially concurring.

I concur in the majority opinion. I believe, however, that the dissent flashes a warning which should not be ignored by prosecutors and lawmakers. It is obvious that the police in the case at bar violated ORS 133.550. That statute requires that the defendant be taken before a magistrate without delay. Since ORS 133.550 is not self-executing, its practical effect has been virtually zero. The dissent points to the remedy devised by the federal courts in similar circumstances, and suggests that this court follow their lead. I am

---

① McNabb v. United States, 318 US 332, 63 S Ct 608, 87 L Ed 819 (1943); Upshaw v. United States, 335 US 410, 69 S Ct 170, 93 L Ed 100 (1948); Mallory v. United States, 354 US 449, 77 S Ct 1356, 1 L Ed2d 1479 (1957).

② See, People v. Hamilton, 359 Mich 410, 102 NW2d 738 (1960), as modified by People v. Hannum, 362 Mich 660, 107 NW2d 894 (1961) and People v. Harper, 365 Mich 494, 113 NW2d 808 (1962); Bader, Coerced Confessions and the Due Process Clause, 15 Brooklyn L Rev 51, 70-71 (1948); Weisberg, Police Power and Individual Freedom—Police Interrogation of Arrested Persons 153, 180-81 (Sowle ed 1962). See also, Hogan & Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo L J 1, 30-33 (1958); Leibowitz, Safeguards in the Law of Interrogation and Confessions, 52 NW U L Rev 86 (1957).

not persuaded that we should adopt that course at this time. I would prefer first to give the legislative and executive branches a reasonable opportunity to make appropriate rules to ensure lawful conduct by police officers.

If those primarily charged with the duty of enforcing the law are unwilling or unable to discharge their duty in this respect, then the courts should not shrink from their duty. Prosecutors should give thoughtful attention to the authorities cited in the dissenting opinion. The evolution of federal rules on search and seizure should not be lost upon state prosecutors. See *Mapp v. Ohio*, 367 US 643, 81 S Ct 1684, 6 L Ed2d 1081 (1961). Oregon should not be unprepared for a similar evolution in the federal law on unreasonable delay in presenting an accused before a magistrate.