PEOPLE *v.* CHARLES D. WALKER

1. ARREST—WITHOUT WARRANT—PROBABLE CAUSE.

Probable cause to arrest without a warrant exists where the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

2. ARREST—WITHOUT WARRANT—NARCOTICS—PROBABLE CAUSE.

A police officer had probable cause to arrest the defendant without a warrant for illegal possession of narcotics and to search the vehicle in which the defendant was a passenger as an incident to the arrest where the officer had received information that the defendant and two other men would be returning between 1:00 and 1:30 p.m. to Grand Rapids from Detroit, where they had purchased heroin, in a two-door, dark-blue, 1966 Pontiac, with its front end damaged and licensed JF 3488, where the information was received from two telephone callers, one of whom had on numerous occasions given the police information leading to convictions, where the police officer, before the telephone calls, had known of the defendant and his two companions and had information that the three men had been seen together, and a few years before the present arrest, had arrested the defendant for a narcotics violation resulting in a conviction, and where the police officer had pursued, at high speed, the car, as exactly described by his informant at the time which the informant had indicated the car would be returning to Grand Rapids.

Appeal from Kent, Roman J. Snow, J. Submitted Division 3 April 7, 1970, at Grand Rapids. (Docket

REFERENCE FOR POINTS IN HEADNOTES

[1, 2] 5 Am Jur 2d, Arrest § 44.

No. 7,467.)  Decided July 28, 1970.  Leave to appeal granted September 28, 1970.  384 Mich 761.

Charles Douglas Walker was convicted of illegal possession of narcotics.  Defendant appeals.  Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,* Prosecuting Attorney, *Wesley J. Nykamp,* Chief Appellate Attorney, and *Donald A. Johnston, III,* Assistant Prosecuting Attorney, for the people.

*Robert G. Quinn, Jr.* (*Carl J. Verspoor,* of counsel), for defendant on appeal.

Before: HOLBROOK, P. J., and BRONSON and E. W. BROWN,* JJ.

HOLBROOK, P. J.  Defendant was convicted by a jury in Kent County Circuit Court of having possession or having under his control, narcotics without a license, contrary to MCLA § 335.153 (Stat Ann 1957 Rev § 18.1123).  On June 28, 1968, the defendant and two others were arrested without a warrant for the offense of which he was convicted.  The defendant was a passenger seated in the back seat of an automobile operated by one Evelle White.  One other passenger, Charles Parrish, was seated beside the driver in the front seat.  The arresting officer had received the information that defendant and the other two persons were transporting narcotics from Detroit to Grand Rapids.  The arresting officer was in the police car following defendant's automobile on highway I-96 and had to maintain speeds up to 85 miles per hour in order to keep within range of

---

* Circuit judge, sitting on the Court of Appeals by assignment.

defendant's car. Defendant's car exited at the College Avenue exit in Grand Rapids, and the police car blocked and stopped defendant's vehicle. The arresting officer, revolver drawn, leaped from the police car and ordered the passengers in the automobile to put up their hands where he could see them. The defendant and the other two persons got out of the car. Prior to this time, however, the defendant dropped his hands down towards the floor, and the arresting officer ordered him to put his hands back up. The arresting officer testified that he first saw the four packets containing heroin on the floor of the back seat of the car by looking through the rear window an instant before he opened the door and told the passengers to get out of the car. The search of defendant at the time of the arrest produced four pills of methadone and a fix kit. The search of the car produced quantities of heroin contained in the four packets which were on the floor of the back seat where defendant had been seated.

Defendant made a motion to suppress the evidence seized by the search at the time of the arrest at the preliminary examination, and renewed the motion before trial in the circuit court.

In addition to the motion to suppress, a motion to quash the information for lack of probable cause to make the arrest was made at the preliminary examination and renewed at trial. From a denial of these motions and the subsequent conviction, this appeal has been taken. Defendant raises three issues for review as follows:

(1) Whether the arrest and subsequent search of the defendant and the automobile in which the defendant was a passenger was a violation of the defendant's constitutional rights, in that the people failed to show probable cause for the arrest and subsequent search, all contrary to the Fourth and Four-

teenth Amendments to the Constitution of the United States and Article I, Section 11, of the Michigan Constitution of 1963?

(2) Whether people's exhibits 1, 2, and 3 were seized by the police pursuant to an illegal search and contrary to the Fourth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 11, of the Michigan Constitution of 1963, and, therefore, should have been suppressed?

(3) Whether the trial court erred in denying defendant's motion to dismiss at the conclusion of the proofs on the grounds that the people had failed to prove that the defendant was in possession of a narcotic drug within the meaning of the statute?

We join the first two issues and consider them together.

Defendant asserted at the preliminary examination, at the hearing on the motion to suppress in circuit court and in this Court that the provisions in Const 1963, art I, § 11 permitting the admission in any criminal proceeding of certain objects, including any narcotic drug "seized by a peace officer outside the curtilage of any dwelling house in this state", is unconstitutional as conflicting with the Fourth and Fourteenth Amendments of the United States Constitution. *Mapp* v. *Ohio* (1961), 367 US 643 (81 S Ct 1684, 6 L Ed 2d 1081, 84 ALR2d 933). We need not rule on this issue because of our ruling on the arrest and search and seizures as stated herein.

The people claim that the arrest without a warrant was legal and the search conducted contemporaneously was lawful and the evidence seized was legally admitted into evidence. The reason for this claim is based on asserted facts made known to the arresting officer by information from a reliable source which caused him to have probable cause to believe that de-

fendant had committed and was committing a felony offense.

Now it is true that the testimony of these facts were not elaborately stated in the testimony at the preliminary examination, nor in the first hearing on the motion to suppress before the Honorable Fred W. Searl. Judge Searl, however, specifically left the door open to a further hearing on the matter to be conducted by the trial judge. Honorable Roman J. Snow considered the motions again before trial on March 3, 1969, and on March 4, 1969, before the actual trial commenced. On March 4, the trial court permitted the people to show that the arresting officer had probable cause to arrest the defendant without a warrant. This pertinent testimony of William E. Freeman is in part as follows:

"*Q.* Sir, are you chief investigating officer in the case against Evelle White, Charles Parrish, and Charles Walker concerning possession of a narcotic, that is heroin, and were you the officer physically making the arrest and search on June 28, 1968 in the City of Grand Rapids?

"*A.* Yes, sir.

\*   \*   \*

"*Q.* Were you working on the vice investigation prior to June 28, 1968 in regard to narcotics in the City of Grand Rapids?

"*A.* Yes.

"*Q.* Did knowledge come to your attention that heroin was purchased or trafficking in the City of Grand Rapids prior to June 28, 1968?

"*A.* Yes, sir.

"*Q.* How did that knowledge come to your attention?

"*A.* Are you speaking of prior to this arrest?

"*Q.* Yes.

"*A.* Through two phone calls that I received.

"*Q.* The nature of the information that you received by these phone calls?

"*A.* It stated that Mr. White, Mr. Parrish and Mr. Walker had left for Detroit,—Michigan in a 1966 Pontiac two-door dark blue with the front-end damaged, 1968 license John Frank 3488 to purchase the drug heroin.

"*Q.* Date and time you received this phone call?

"*A.* I received the first phone call approximately in the area of 10 a.m. or shortly before.

"*Q.* The information as to the time that the car had left Grand Rapids?

"*A.* Yes, that it had left somewhere between 7 and 8 o'clock, as best I could recall.

"*Q.* Any information as to the time it was expected back?

"*A.* They expected that the car would go right there, make the purchase, and possibly return somewhere between 1 and 1:30 p.m. on this date.

"*Q.* The purpose of the trip was given as what?

"*A.* To purchase the drug heroin.

"*Q.* The second phone call?

"*A.* This was from another party whom I don't know the name of that gave part of this information, stating a car, a Pontiac belonging to Mr. White had gone to Detroit to pick up, they called it "stuff", and it would return in the early afternoon.

"*Q.* In regard to your dealings before that with the person making the first telephone call, had you had prior dealings with that person?

"*A.* Yes, I have.

"*Q.* Over what period of time, if you may state?

"*A.* At least five years.

"*Q.* Had you, as a result of information formerly given you by this person making that first phone call, ever instituted an investigation that resulted in an arrest and a conviction for a crime?

"*A.* Yes, sir, I have.

"*Q.* How many occasions, if you recall?

"*A.* Narcotic, twice; armed robbery two or three times; and other numerous smaller offenses.

\* \* \*

"*Q.* Did you know these persons identified as White, Parrish, and Walker, whose names were used in this first phone call that you received around 10:00 o'clock on June 28, 1968?

"*A.* I had known Mr. Walker and Mr. Parrish for several years, and Mr. White was a new person to me, a new name; not in this particular phone call, but within the last month or two, was a new name to me.

"*Q.* Had you had information prior to the phone call that White, Walker, and Parrish had been together on other occasions?

"*A.* Yes, I had.

"*Q.* What type information had you received in regard to that?

"*A.* There was information given to advise us on prior occasions concerning Mr. White by a relative of Mr. White's, and Mr. Walker, and Mr. Parrish, but the information itself came from a relative of Mr. White's.

"*Q.* Were you aware of a criminal record involving Mr. Parrish and Mr. Walker?

"*A.* Yes, I was.

"*Q.* What were you aware of on June 28 prior to 1:30 o'clock in regard to Mr. Walker's record?

"*A.* I, myself, had arrested Mr. Walker in 1962 for trafficking in heroin, and at the time that I was investigating Mr. Walker, Mr. Parrish was a frequent acquaintance, visitor, of Mr. Walker, and this would be at 426 Lafayette SE at that time and in a house on Jefferson which is now torn down where Mr. Parrish was living, and numerous places on the city streets.

"*Q.* You have mentioned one criminal conviction for these men that you knew of?

"*A.* I knew of several, but the 1962 conviction I was the arresting officer of Mr. Walker.

\* \* \*

"*Q.* Where did you first observe that automobile June 28?

"*A.* It would be east of the city, approximately eight miles to ten miles.

"*Q.* What did you observe it doing?

"*A.* It was driving west on I–96 with the three men in it at a high rate of speed.

"*Q.* Had you received information regarding this automobile from the police source just prior to this?

"*A.* I had.

"*Q.* What was that?

"*A.* It was a radio communication from Officer Richard Steele that they had observed the car further east headed in our direction.

\* \* \*

"*Q.* Did you follow this car?

"*A.* I did.

"*Q.* Describe the events?

"*A.* Captain Bender was driving the vehicle that we were in, and as they passed our point we fell in behind them as quickly as we could. We reached speeds up to over 85 miles per hour all the way into the city except where it slowed slightly at a curve just east of the county jail, accelerating again, reaching speeds of 85 until it slowed for the exit at College Street and I–96, which is the penetrator into the College exit ramp. They stopped at the stop sign— no traffic, and they immediately turned left.

"*Q.* With a signal or without?

"*A.* Without a signal.

"*Q.* Without a turn signal?

"*A.* Without a turn signal, yes, sir. They did stop, however. They fell into the southbound lane of College Avenue, caught the light green to Michigan Street, and they caught the green again at Lyon Street, and approximately in front of 122 College

NE there was a line of traffic backed up from Front Street, and they came to a stop in this line of traffic, or almost to a stop. At this point we pulled up on the left side so that our car overlapped their left front fender slightly so they couldn't go forward, and at this point I jumped out of the passenger's side with my revolver, and told all the subjects to keep their hands high where we could see them.

"*Q.* How were they able to hear you?

"*A.* I shouted this in a loud voice. I was right next to the car, probably a foot or two from the window.

"*Q.* What did they do?

"*A.* All the subjects looked in my direction. Mr. White put his hands on the steering wheel. Mr. Parrish, who was on the passenger's side of the front seat, put his hands up on the dash. Mr. Walker had his hands about level with the front seat, and then Captain Bender came around and took my spot. I went around in front of the car to the other side, and as I reached the right front side Mr. Walker's hands quickly went below the seat and then came back up.

\* \* \*

"*Q.* What did you then do? Where were you, first, when you saw the hands go below the seat?

"*A.* I was approximately at the right front fender of the 1966 Pontiac.

"*Q.* Did you feel if that were a gun or something that the hands were reaching for that you could prevent that?

"*A.* No, I couldn't in that spot.

"*Q.* Did you do anything to prevent this?

"*A.* Yes, sir. I hollered in to get his hands back up and they did come back up, and then I asked all three to come back out of the car.

"*Q.* How close were you to the car?

"*A.* I was right beside the car.

"*Q.* What did you observe in the car at this point just as this happened?

"*A.* I had to reach back by the window so I could see Walker, and then on the floor where his hand had gone before, right in front of his feet were four manila packets or envelopes approximately 2 by 4 inches.

"*Q.* Are those marked, the envelopes, exhibit 3 from the preliminary examination?

"*A.* I believe they are.   And I yanked open the door, and Parrish came out first, and pushed Parrish on by me, and at this time the other officers had arrived, and Walker came, pushed the seat forward, and came out and as he came out I could again see these packets on the floor board right between his seat.   He came out, and I watched his hands, took hold of his arm, replaced my gun, and began to search Mr. Walker.

"*Q.* For what?

"*A.* For weapons, and then for narcotics.

"*Q.* Did these four envelopes appear familiar to anything you had seen on narcotic investigations in the past?

"*A.* Yes, sir.   I have seen this type envelope many times used to package both marijuana and heroin. This is one of the types that they used here.

*       *       *

"*Q.* You in fact searched what part of Walker first?

"*A.* I was behind him.   I reached up and touched his belt, and then across his pocket.   In his right hand pocket I could feel a bulge.

"*Q.* What did you do?

"*A.* I stuck my hand in his pocket and pulled out a works kit, is what it turned out to be.

"*Q.* Did you know what it was when you felt the bulge?

"*A.* No, not until I pulled it out of his pocket.

"*Q.* Did you have any thoughts what it conceivably could be as you touched it instantaneously and reached for it?

"*A.* I first, I felt in his pocket, and I thought it could be a works kit when I felt it.

"*Q.* Had you thought of it being a weapon?

"*A.* It is possible. It is big enough. It could have been.

"*Q.* Has that been marked and placed in an envelope, marked as an exhibit from the preliminary examination?

"*A.* Yes, I believe it has.

"*Q.* What else did you search on Walker?

"*A.* I searched the rest of him, from his right hand pocket I went to his left hand pocket where I found four white pills marked Lilly which are Methadone pills, and these were packaged in a piece of tinfoil.

"*Q.* Were they found in an envelope marked Exhibit 1 from the preliminary examination?

"*A.* Yes, they were."

In the case of *Draper* v. *United States* (1959), 358 US 307 (79 S Ct 329, 3 L Ed 2d 327) on pp 312–314 it is stated in part:

"Nor can we agree with petitioner's second contention that Marsh's information was insufficient to show probable cause and reasonable grounds to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant. The information given to narcotic agent Marsh by 'special employee' Hereford may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it. And when, in pursuing that information, he saw a man, having the exact physical attributes and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a 'fast' pace toward the station exit, Marsh had personally verified every facet of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of

heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, Marsh had 'reasonable grounds' to believe that the remaining unverified bit of Hereford's information—that Draper would have the heroin with him—was likewise true.

" 'In dealing with probable cause,  *  *  *  as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar* v. *United States*, [(1949) 338 US at 175]. Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll* v. *United States* [1925], 267 US 132, 162 (45 S Ct 280, 288, 69 L Ed 543, 555, 39 ALR 790).

"We believe that, under the facts and circumstances here, Marsh had probable cause and reasonable grounds to believe that petitioner was committing a violation of the laws of the United States relating to narcotic drugs at the time he arrested him. The arrest was therefore lawful, and the subsequent search and seizure, having been made incident to that lawful arrest, were likewise valid. It follows that petitioner's motion to suppress was properly denied and that the seized heroin was competent evidence lawfully received at the trial."

Defendant cites the case of *Beck* v. *Ohio* (1964), 379 US 89 (85 S Ct 223, 13 L Ed 2d 142) in support of his position that probable cause was not present for his arrest without a warrant. *Beck* v. *Ohio, supra,* is not analogous because the facts are different than in the instant case. On pp 96, 97 of the opinion, it is stated:

"When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed. *Carroll* v. *United States,* [1925], 267 US 132, 162 (45 S Ct 280, 288, 69 L Ed 543, 555, 39 ALR 790). If the court is not informed of the facts upon which the arresting officers acted, it cannot properly discharge that function. All that the trial court was told in this case was that the officers knew what the petitioner looked like and knew that he had a previous record of arrests or convictions for violations of the clearing house law. Beyond that, the arresting officer who testified said no more than that someone (he did not say who) had told him something (he did not say what) about the petitioner. We do not hold that the officer's knowledge of the petitioner's physical appearance and previous record was either inadmissible or entirely irrelevant upon the issue of probable cause. See *Brinegar* v. *United States,* [1949], 338 US 160, 172–174 (69 S Ct 1302, 1309, 1310, 93 L Ed 1879, 1888, 1889). But to hold that knowledge of either or both of these facts constituted probable cause would be to hold that anyone with a previous criminal record could be arrested at will."

The rule in Michigan which is consonant with *Draper* v. *United States, supra,* is stated in the case of *People* v. *Mohl* (1930), 252 Mich 469, 470, 471 as follows:

"Was the arrest without a warrant illegal? This question comes before this 'Court so frequently on similar facts that it may be well to call attention again to the language of Mr. Justice SHARPE in *People* v. *Kamhout* (1924), 227 Mich 172:

" 'What we do state to be the rule by which this Court will be governed is, that if an officer, charged with the enforcement of the law, from the exercise of his own senses, or acting upon information re-

ceived from sources apparently so reliable that a prudent and careful person, having due regard for the rights of others, would act thereon, has reasonable and probable cause to believe that intoxicating liquor is being unlawfully transported in an automobile in his presence, he may arrest the offender or search for and, if found, seize the contraband therein without a warrant to do so.'

"In the instant case, the sheriff testified that he had previously received several reports that Mr. Mohl was selling moonshine whisky; that on the day of the arrest he received reliable information that Mohl would be at a designated place with moonshine; that he went there with two deputies; that when the Mohl car approached it was slowed down and the two deputies got on the running board. Both of the deputies testified that when they went around the car to get on the running board, they smelled whisky and saw a can, such as they had previously seen used for conveying moonshine, sitting in the rear of the car; that when they got on the running board the driver accelerated his speed and that they then placed both men under arrest; that after the arrest one of the deputies lifted the can from the rear of the car and gave it to the sheriff. It was found to contain moonshine whisky.

"These facts show ample justification for defendant's arrest and the seizure of the liquor. The court did not err in denying the motion to suppress the evidence."

Also, see *People* v. *Harper* (1962), 365 Mich 494, and *People* v. *Sansoni* (1968), 10 Mich App 558.

We rule in this case that the people brought forth testimony in a hearing before the trial that the arrest of the defendant without a warrant was based on probable cause and was lawful and that the search and seizure having been made incident to that lawful arrest were valid and the evidence properly admitted. *People* v. *Panknin* (1966), 4 Mich App 19.

In reviewing the record and the testimony, we must conclude as to defendant's third issue, that there was sufficient evidence presented which, if believed by the jury, would justify a finding of guilt beyond a reasonable doubt.

Affirmed.

All concurred.